## THE MARYLAND, DELAWARE AND VIRGINIA RAILWAY COMPANY *vs.* JAMES H. BROWN.

*Master and Servant—Collision with Runaway Engine—Evidence as to Defects in Engine—Proof of Diminished Earning Capacity—Custody of Live Engine Left Standing on Track—Evidence of Usage of Railways—Admission Without Objection of Incompetent Testimony—Evidence of Defect Existing Before Accident—Assumption of Risks by Servant—Instructions to the Jury.*

On the trial of a case wherein it was alleged that plaintiff was injured in consequence of defendant's failure to supply a safe engine for use on its road, the plaintiff was asked to describe the type of the engine in question. He replied: "I cannot exactly tell what type she was; the only thing I can tell you is that she was old and worn out apparently when they got her." *Held,* that this answer is fairly responsive to the question, and a motion to strike it out was properly overruled.

In an action to recover damages for personal injuries caused by defendant's negligence, it is competent to show how the injuries affected the earning capacity of the plaintiff by evidence of what his earnings were before the injury and what he was capable of earning, and did earn, afterwards.

When the question is whether the defendant railway company was or was not negligent in its management of live engines left standing on a side track, evidence as to the particular custom or usage of that defendant in such management is not admissible, since that custom might be either careful or negligent, and in itself does not aid in determining the question at issue.

When the injury constituting the cause of action resulted from a runaway railway engine, a witness cannot be asked to state the custom of railroad companies as to leaving engines in the yard with steam up. Such question is too vague, and is not limited to the custom of well-conducted roads.

When defendant's locomotive engine, which had been left standing alone on a side track, ran away and collided with an engine on which plaintiff was serving, the defendant company's master mechanic cannot be asked to state how the accident happened, when he did not examine the runaway engine before the accident, and did not see it at the time, and only examined it after it had been wrecked by the collision.

Plaintiff, a locomotive engineer on defendant's road, was injured in August by collision with an unmanned runaway engine. He testified that in the previous July he had operated the latter engine; that it was old, and in bad shape, and that the throttle-bar would work open and put it in motion. *Held,* that this evidence is admissible without proof that the defect continued to exist down to the time of the accident. Such defect is continuous unless repaired, and it was for the defendant to show that repairs had been made.

A servant assumes the risk of dangers incident to the service which cannot be avoided by the exercise of ordinary care on the part of his employer, but he does not assume the risks incident to the work as conducted in accordance with the individual methods of the employer, if these methods are negligent.

When a locomotive engine which had been left standing alone with steam up on a track, escapes and causes injury, it is ordinarily a question for the jury to determine whether the railroad company had exercised due care in the custody of the engine.

It is the duty of a railroad company to adopt and enforce reasonable rules for the inspection of its engines and for their safe custody while left under steam on a side track.

Although incompetent evidence was admitted to prove some particular fact, yet the judgment will not for that reason be reversed if the same fact was afterwards proved by competent evidence.

When incompetent evidence has been admitted without objection it will be treated as properly in the case.

One of the counts of the declaration in this case charged that the defendant company was negligent in failing to provide reasonably safe equipment for the performance of work by

its employees, and another count that the defendant had failed to exercise due care in the inspection of the equipment. The plaintiff's evidence at the trial tended to show that a locomotive engine, at the time it was bought by the defendant, was an old one; that subsequently it was in bad condition; that its throttle bar would work open; that this defect existed a month before the accident in question; that the engine was left standing alone on a side track with steam up and, escaping, caused injury to the plaintiff. *Held,* that defendant's prayers instructing the jury that under the pleadings and evidence, the plaintiff was not entitled to recover were properly refused, since there was evidence that the defective condition of the engine could have been discovered by inspection, and also that due care had not been exercised in its original selection.

*Held,* further, that defendant's prayers asserting that the engine was in good condition when placed on the side track, and that there was no evidence to show that it was defective, were erroneous, as was also a prayer which ignored defendant's non-delegable duty to provide safe equipment.

*Held,* further, that a prayer which denied the right of the plaintiff to recover if he continued in the service of the defendant, after knowledge of the defect in the engine, was properly rejected, since the plaintiff was justified in assuming that such a patent defect as that which the evidence showed to exist in the engine, would be discovered under any reasonable system of inspection, and would be promptly remedied.

*Decided January 12th 1909.*

Appeal from the Court of Common Pleas of Baltimore City (SHARP, J.), where there was a judgment on verdict for the plaintiff for $3,000.

*Plaintiff's 2nd Prayer.*—The jury are instructed that it is the duty of the employer to use due and reasonable diligence, having respect to the nature of the service of the employed, to provide suitable appliances and instrumentalities. for doing the work. And if the jury find from the evidence

that at the time of the accident and injury to the plaintiff, he was in the service of the defendant as a locomotive engineer, driving a locomotive to which a train of cars was attached from Rehobeth Beach, Delaware, to Love Point, Maryland, and whilst so engaged on the 6th day of August, 1905, a collision occurred between said engine so driven by the plaintiff, and another engine unmanned, the property of the defendant, and running wild on the same track on which the plaintiff was operating his engine, and that by reason of such collision the plaintiff was injured, and that such collision occurred because said runaway engine was unsafe and unfit for the uses and purposes to which it was applied by the defendant under all the evidence in this case, then if the jury further find that the plaintiff was without negligence or want of care on his part in the premises directly contributing to the happening of the accident and injury, and that such accident and injury to the plaintiff was directly caused by the negligence and want of care in the premises of the defendant, the plaintiff is entitled to recover. (*Granted.*)

*Plaintiff's 3rd Prayer.*—If the jury shall find a verdict for the plaintiff, then in estimating the damages they are to consider his health and condition before the injury complained of, as compared with his present condition in consequence of said injury, and how far, if at all, it is calculated to disable him from engaging in those employments for which, in the absence of such injury, he would have been qualified, and also the physical and mental suffering, if any, to which he was subjected by reason of said injury and to allow him such damages as in the opinion of the jury will be a fair and just compensation for the injury which he has sustained. (*Granted.*)

*Defendant's 1st Prayer.*—The defendant prays the Court to instruct the jury that there is no evidence in this case legally sufficient to show that the defendant failed in any legal duty owing by the defendant to the plaintiff and that, therefore, under the pleadings and evidence their verdict must be for the defendant. (*Refused.*)

*Defendant's 2nd Prayer.*—That there is no evidence in this case legally sufficient to entitle the plaintiff to recover and that, therefore, under the pleadings and evidence herein the verdict must be for the defendant. (*Refused.*)

*Defendant's 3rd Prayer.*—That if the jury find that the locomotive called in the testimony "runaway locomotive" was standing on the siding on the day the injuries were sustained by the plaintiff, as testified to by the defendant's witnesses, and that the said locomotive was in charge of the defendant's employees, as testified to by the defendant's witnesses, and that the said locomotive ran away and that the said running away was occasioned by the neglect or carelessness on the part of those placed in charge of the same by the defendant, then their verdict must be for the defendant. (*Refused.*)

*Defendant's 4th Prayer.*—That if the jury shall find that the plaintiff was in the employ of the defendant in July, 1905, as engineer and that as such engineer he ran Engine No. 1, as testified to by him, and that in running said engine he discovered that she was defective, in the manner testified to by him, and that notwithstanding such discovery he remained in the employ of the defendant until August 6th, 1905, and that on said last mentioned day he was injured in the manner testified to by the plaintiff and his witnesses, that engine No. 1 ran away by reason of the defect aforesaid, the plaintiff is not entitled to recover under the pleadings and evidence and their verdict must be for the defendant. (*Refused.*)

*Defendant's 5th Prayer.*—That if the jury shall find that on August 6th, 1905, the plaintiff was in the employ of the defendant in the capacity of engineer, and that late in the afternoon of said day was bringing, in said capacity, one of the defendant's trains to Love Point, and if they shall further find that engine No. 1 on August 6th, 1905, was in good order; that on the morning of that day she was moved by the witness Exeter to the water tank, and then returned to the side track; that after reaching said track, said witness turned off the steam by closing the throttle valve, put the reverse bar

in the centre, chocked her wheels and then left her in charge of the hostlers; that said hostlers were competent employees; that said engine stood on said side track until late in the afternoon of August 6th, then their verdict must be for the defendant, notwithstanding they may further find that late in said afternoon said engine started off in the manner testified to by the plaintiff's witnesses and collided with the defendant's train aforesaid, on which plaintiff occupied the position of engineer, thereby injurying the plaintiff. (*Refused.*)

*Defendant's 6th Prayer.*—That if the jury find from the evidence that the plaintiff sustained the injuries testified to by the plaintiff's witnesses, and that the injuries were caused by a defective condition of the locomotive, called in the testimony "runaway locomotive," and if they find that the said defective condition was due to a latent or hidden defect not discoverable by any reasonable or ordinary inspection, then their verdict must be for the defendant. (*Granted.*)

*Defendant's 7th Prayer.*—That an employer is bound to use reasonable care to procure sound machinery and appliances for his employees, but it is not bound to keep such machinery and appliances free from defects. (*Refused.*)

*Defendant's 8th Prayer.*—That if the jury find from the evidence that the injuries to the plaintiff were the result of an inevitable accident, then their verdict must be for the defendant. (*Granted.*)

*Defendant's 9th Prayer.*—That if the jury find from the evidence that the plaintiff sustained the injuries, as testified to, by the plaintiff's witnesses, and that the injuries were caused by a defective condition of the throttle valve of the locomotive, called in the testimony, "runaway locomotive," and if they find that the defective condition of the throttle was due to latent or hidden defects not discernable by any reasonable or ordinary inspection, then their verdict must be for the defendant. (*Refused.*)

*Defendant's 10th Prayer.*—That inasmuch as the evidence shows that on August 6th, 1905, the plaintiff was employed by the defendant in the capacity of engineer in running its

engine and inasmuch as the evidence further shows that on the morning of August 6th, 1905, the witness Exeter also in the employ of the defendant in its machine shops, placed engine No. 1, then in good condition, on the side track at Love Point, turned off the steam by closing the throttle valve, put the reverse bar in the centre, chocked her wheels as testified to by him, and then left her in charge of the hostlers who were competent employees, and that said engine stood on said side track until late in the afternoon of the 6th day of August, and that said side track ran up grade towards and entered the roundhouse track by a switch, and that the roundhouse track entered the main track by a switch, and that said engine in order to get on the main track had to run through said two switches, their verdict must be for the defendant under the pleadings and evidence. (*Refused.*)

*Defendant's 11th Prayer.*—That inasmuch as the evidence shows that engine No. 1 was placed on the side track by the witness Exeter, her steam shut off by the closing of her throttle valve, her reverse bar in the centre and her wheels chocked, and inasmuch as there is no evidence to show that engine No. 1 was defective in such a way that she could start off in the condition and under the circumstances in which she was placed by the witness Exeter on said side track, and inasmuch as the evidence shows that the defendant employed competent employees and placed them in charge of said engine, their verdict must be for the defendant under the pleadings and evidence in this case. (*Refused.*)

*Defendant's 12th Prayer.*—The jury are instructed that the defendant is not an insurer of the lives or limbs of its employees, but is bound to use ordinary care for their protection; that the plaintiff when he accepted employment with the defendant assumed all risks ordinarily incident to the business as conducted by the defendant; that among such risks is the negligence of co-employees; that Exeter and the two hostlers are co-employees of the plaintiff, and if the jury find that engine No. 1 ran away by reason of the negligence of said Exeter and the two hostlers, or any of them, the plain-

tiff is not entitled to recover, and their verdict must be for the defendant, provided that the jury shall find that the defendant used ordinary care and caution in supplying a sufficient number of hostlers to watch and attend engine No. 1 placed on the side track in question, under the conditions and circumstances testified to by the plaintiff's witnesses. (*Granted.*)

*Defendant's 13th Prayer.*—That the defendant is not an insurer of the lives or limbs of its employees, but is bound to use ordinary care for their protection; that the plaintiff when he accepted employment with the defendant assumed all risks ordinarily incident to the business as conducted by the defendant, which he knew or could have known by the use of ordinary care, and if the jury shall find that the witness Excter on August 6th, 1905, placed engine No. 1 on the side track; that he chocked her wheels as testified to by him; that he closed her throttle valve and put the reverse bar in the centre and then left her in charge of two hostlers, as testified to by him; that said side track ran up grade to and joined the roundhouse track by a switch, and that the roundhouse track joined the main track by a switch, and that said engine No. 1 could only get into the main track by running through said two switches; that engine No. 1 stood as so placed until late in the afternoon of August 6th, their verdict must be for the defendant under the pleadings and evidence in this case, unless the jury shall find that the defendant did not use ordinary care and caution in supplying a sufficient number of hostlers to watch and attend to her. (*Refused.*)

The cause was argued before Boyd, C. J., Pearce, Schmucker and Worthington, JJ.

*Ralph Robinson* and *Edward Duffy,* for the appellant.

*William Collon,* for the appellee.

PEARCE, J., delivered the opinion of the Court.

The appellee, who was employed by the appellant as an engineer to operate certain of its trains over its railroad between Love Point, in Queen Anne's County, Maryland, and Rehoboth, Delaware, brought this action to recover damages for injuries received by him in a head-on collision between the engine and passenger train which he was running at the time, and another engine with a tender and coal car attached which was unmanned and running wild on the same track, the railroad being a single track road.   The collision occurred about eight o'clock in the evening of August 6th, 1905, at a point a few miles from the western terminus of the road at Love Point, and almost immediately after crossing Kent Island Narrows, the stream which separates Kent Island from the main land of Queen Anne's County.   In crossing this stream the plaintiff had reduced the speed of his engine and train to about ten miles an hour in accordance with standing instructions, and was just getting under headway again when he and his fireman caught sight of the runaway engine about two engine lengths away when it was impossible to do anything to avert the collision or break its force, and the result was that the plaintiff was thrown from his engine unconscious, and was severely injured; that he was not able to do anything for over a year and incurred a bill for medical services of $100; that he was scalded, cut on the head, and had his teeth knocked out and still suffers much and constant pain; that he attemp'ed, after the lapse of a year, to run a train on defendant's road, and did so for about a month, when he was unable to stand it, and was obliged to give it up, and took up firing for the United Railways and Electric Company at the Pratt Street Power House, which is much lighter work than running a train.   His wages as engineer were $80 a month, and his pay as fireman for the United Railways was two dollars and a quarter per day and he began that work in June, 1907.   Before that he kept a livery stable, but made not over a dollar a day at that, and he only kept this stable about six months in all.   The engine he was running at the

time of the collision was known as No. 3, and it was properly
manned and lighted. The runaway engine was known as
No. 1, and was unlighted and unmanned. The jury found a
verdict for the plaintiff for $3,000, and from the judgment
on that verdict the defendant has appealed. There are twelve
bills of exception in the record, of which, eleven are to rul-
ings on evidence, and one to the ruling on the prayers.

There are three counts in the declaration. The first count
charges as the cause of the plaintiff's injuries that the defend-
ant did not exercise due and ordinary care in the selection,
employment, and retention of reasonably competent and
proper co-employees with whom the plaintiff was required to
work.

The second count charges the defendant with negligence
in failing to provide reasonably safe and proper tools and
equipment for the performance of the work required of its
servants, and exposed him to unnecessary risk and danger
while so employed, in that while running his own train on
defendant's road on Aug. 6th, 1905, his said train, because
of the unfit and unsafe condition of another train on said
road, collided with said last mentioned train, and he was
injured in consequence thereof.

The third count charges that the defendant neglected to
exercise due and ordinary care in the inspection of the equip-
ment of the railroad, in and about which the plaintiff was
required to work, in consequence of which the plaintiff's train
collided with an unmanned and wild engine on the same
track, causing the injuries complained of.

The first exception arose in this way: The plaintiff, after
testifying to the facts of the collision, said that he had run
Engine No. 1 before the collision, and being asked what was
her condition at that time, replied that she was not in very
good condition. The defendant moved to strike out that
question and answer, and the Court said: "You will have to
bring it nearer than that—say within a week or so." Plain-
tiff's counsel replied: "I will cover that," and the Court
said: "It will be admitted subject to exception." The plain-

tiff then testified as follows: "I think it was in July I ran her, the latter part of July to the best of my recollection. It was in bad shape; it was an old engine, and when you ran her on the road, and you happened to take your hand off the throttle, her throttle bar would work open. The throttle bar is what gives her life; it is what makes her move; when it opens it puts her in motion." The court here asked: "Why did it open?" and he replied: "The throttle was old and worn out, and the spring was weak to the best of my judgment." He was then asked to describe the type of engine No. 1, and answered, "I cannot exactly tell what type she was; the only thing I can tell you is that she was old and worn out apparently when they got her."

Defendant moved to strike out the last answer as not responsive to the question and the Court refused the motion. We do not think it can be said this answer was not fairly responsive to the question. This man was not a mechanical engineer trained or experienced in the construction of locomotives. He was a farmer first then foreman of a force for the defendant, and in 1905 became one of its locomotive engineers. His answer imported that it was an old type, being as he added, worn out when the defendant got it. Moreover this answer could not work any injury to the defendant, because the next witness John F. Hess a fireman of defendant, and assistant machinist, testified without objection, that it was "an old engine, about the type used and operated on the P., B. & W. R. R. many years ago." There was therefore certainly no reversible error in this exception. The second, third and fourth exceptions all relate to proof of the plaintiff's earning capacity as affected by his injuries and may be considered together.

Having previously described his injuries, and stated that in consequence he was unable to pursue his former occupation, or to perform as hard work as before, he was asked in the second exception, what income, if any, he had derived from any source since the accident. He replied that he was not able to do any work until June, 1907, when he went to

firing for the Electric Railways at a Power House, which is light work. In the second exception he was asked what he received for this work, and he replied two dollars and a quarter a day. In the third exception he was asked what income, if any, he had before June, 1907, and he replied only from a livery stable he kept for about six months which gave him a bare living, about a dollar a day. It was certainly proper for the jury to know how his injuries affected his earning capacity, and there could be no better evidence of this than a comparison of what he had testified were his earnings at the time of his injury, with those he was capable of earning and did receive afterwards. It was the privilege of defendant upon cross-examination or otherwise to show, if it could, that he did, or could, with proper effort, have earned more than he testified, and we can perceive no error in these rulings.

The fifth, sixth and seventh exceptions relate to the exclusion of evidence offered by defendant as to its custom in the conduct of its business.

The defendant's Assistant Master Mechanic, Louis Exeter, being called for the defendant, testified that on the morning of the accident he repaired the injector of Engine No. 1, which the hostler reported out of order and that when this was done she was in first-class order; that he then backed her to the siding from the main track to the roundhouse, chocked her, put a bar in the centre and left her; that he looked at her again about 5.30 that evening and her throttle bar and reverse bar were all right and she was in first class condition for·service; that the duties of a hostler are to clean and fire the engines, and keep them steamed and watered, and to be around the roundhouse and watch the locomotives; that some hostlers look after five, some after ten and some as many as thirty engines, but on that day, at that time, there was only one to look after.

He was then asked "Is he expected to stay on the engine?" This was objected to, but was answered "No," after objection was made, and on motion this was stricken out. This was

the fifth exception. He was then asked "What is the custom down there as to locomotives when they are brought in; what is done with them; what is done as to their steam and how is their steam kept?" This was the sixth exception. He was further asked: "What was the custom as to railroad companies leaving engines in the yard when they are not in actual service, with steam on them," and this is the seventh exception.

It would hardly be necessary to cite authority to sustain the rulings on the fifth and sixth exceptions, since the usage or custom there inquired into was merely the custom of the defendant. Its custom might be either careful or negligent, and, in itself, could not aid the jury in determining whether the defendant was or was not negligent in its management of live engines left standing on a side track. That was to be properly determined from the evidence as to how that engine was cared for, under such instructions as should be sought and granted by the Court. The servant does not assume the risk attending the work as conducted in accordance with his employer's *individual* methods. *Labatt on Master & Servant,* sec. 53, page 137. He assumes only those which cannot be obviated by the exercise of ordinary care, *idem,* sec. 2, page 4.

The question which gave rise to the seventh exception is not in our opinion properly framed. It is not proposed to show a universal, or even a general custom, prevailing in railroad management. It is so vague as to leave it in doubt whether it was intended to apply to all, or only to some of the vast number of railroads in this country. It does not limit the question to well conducted railroads, and would permit the jury to adopt a standard of care based upon the custom of other roads, whether careful or negligent. The requirement that the inquiry as to usage or custom in such cases should refer to well conducted railroads, was emphasized in *Benson* v. *N. Y. N. H. & H. R. R.* by the Supreme Court of Rhode Island, in 49 At. Rep. 691, and also in *L. & N. R. R.* v. *Jones,* by the Supreme Court of Ala., 30th *South Rep.* 589. In the latter case the Court said: "A charge propos-

ing to make a standard test of duty by the usage of eight rail-
road companies was invasive of the province of the jury."
We find no error in these rulings.

The eighth and ninth exceptions present the same question
substantially and differ but little in principle from the excep-
tions just considered.    James E. Willey, one of the defend-
ant's locomotive engineers, had testified that he ran No. 1
from Rehoboth to Love Point the day before the accident;
that the throttle did not leak, and he had no trouble with it;
and he then stated what he did with this engine when he
came in from that run.   He was then asked: "Is it the prac-
tice *down there* for engineers when they bring their locomo-
tives in to do just what you have done in this case ?"   And
again he was asked:  "State whether or not an engineer is
expected to report the condition of his engine, if it is in bad
condition when he brings it in ?"    Both questions were
objected to, and the witness was not allowed to answer.

What has been said of the three preceding exceptions is
applicable to these, and in addition thereto both are leading
questions.   The last really asks for a rule of the company,
and the best evidence would be the rule itself, to be followed
by proof of compliance on that occasion with the rule.   Not-
withstanding this ruling however, the record shows that after
it was made, this witness testified "that witness received, and
his instructions were, to report the condition of the engine,
and that he reported it to the repair shop," and the record
also shows that before the eighth exception he testified with-
out objection that, "he reported her condition was all right
for service," so that the defendant received the full benefit
of the question in the ninth exception.

Marion F. Young testified for defendant that he was its
assistant Master Mechanic, and saw Engine No. 1 when she
was delivered to defendant in May or June, 1905, and that
she was in good condition at the time of the accident.   He
then testified at considerable length as to the construction of
Engine No. 1, using a sectional blue print of a similar loco-
motive for the purpose of illustration, and testifying that

when the reverse bar is in the centre (as Exeter had testified
he left it when the engine was placed on the side track), the
locomotive could not move because the ports through which
the steam is let into the steam chest are closed, and that the
opening of the throttle would not open the ports.   He was
competent to so testify and the testimony was proper for the
jury.   He was then asked:  "Do you know how this acci-
dent happened?" and the plaintiff objecting, he was not per-
mitted to answer, and this constitutes the tenth exception.
We have carefully examined the testimony of this witness to
discover the foundation for this question.   There is not a
particle of evidence when this witness saw this engine, or
examined it, between its arrival and this accident.   The only
evidence is that he examined the steam pipes of this engine
after the accident, leading to the throttle, and they were in
good condition.   He said:  "She was not just old junk, and
that the company was keeping some of the cross heads and
valves which they may use some day."   There was no evi-
dence that he was near the engine, or that it was within his
sight when it escaped.   But the defendant contends that he
should have been allowed to answer this question, "both be-
cause he *may* have been present at the time No. 1 left, or
because he found out the reason she left by an examination
of her after the accident."   If he was present when she es-
caped, that fact should have been affirmatively shown, as the
foundation for the question, though we are not to be under-
stood as saying that this alone would be a sufficient founda-
tion without a full statement of all that he saw at the time
of the escape, and we cannot agree that this post-mortem ex-
amination of an engine wrecked by such a collision, could
enable this witness to testify that he *knew* the cause of the
accident.   It is perhaps possible that as an expert machinist,
he might *form some opinion* of the cause of the accident, but
we are not prepared to say that the expression of such an
opinion would afford the jury any rational basis for a con-
clusion by them, and in our opinion the ruling was correct.

At the close of all the testimony the defendant moved to

strike out the testimony of the plaintiff, as to the condition of the engine in July, 1905, and the defect in the throttle bar, all of which was admitted subject to exception; also to strike out the testimony of John A. Roe, the fireman on plaintiff's train at the time of the accident, to the same effect as Brown's, relating to the condition of the throttle. The record shows that Roe's testimony was not admitted subject to exception and therefore cannot be stricken out. Nor do we think the testimony of either should be. We think this testimony brings the inquiry sufficiently close to the accident in point of time, if there is no other objection to its admission.

The defendant contends that proof of defect before an accident cannot be received without offer of proof to show that the thing remained in the same condition down to the moment of the accident. In discussing this subject, Mr. Wigmore in vol. 1, sec. 437 of his work on Evidence, says: "That no fixed rule can be prescribed as to the time, or the conditions, within which a prior or subsequent existence is evidential, is sufficiently illustrated by the precedents from which it is impossible (and rightly so) to draw a general rule. They may be roughly grouped into two classes—those in which the evidence has been received without any preliminary showing as to the influential circumstances remaining the same in the interval (thus leaving it to the opponent to prove their change by way of explanation in rebuttal) and those in which a preliminary showing is required. Whether it should be required, must depend entirely on the case in hand, and it is useless to look to or wish for any detailed rules. * * * The matter should be left entirely to the trial Court's discretion."

This is in accord with what was said in *Brooke* v. *Winters*, 39 Md. 509, that, "whether the proposed proof of facts subsequent to the suit were admissible or not did not depend upon the time of their existence *before* or after the suit, but upon their relevancy to the issue and their capability of explaining it. The *mere fact* that such evidence referred to

circumstances subsequent to the suit, did not, *per se,* render it collateral and inadmissible."

We think the discretion of the Court was not abused, or mistakenly exercised, in refusing to strike out this evidence. Such a defect is in its nature continuous unless repaired. If repaired it was in defendant's power to show such repair, and this it did not do. The witness, Exeter, testified that he repaired the injector but he discovered no defect in the throttle and made no repairs upon it. The witness, Young, who succeeded Exeter as assistant master mechanic, made no repairs and discovered no defect. They both denied the existence at any time of such defect, and their denial went to the jury with the plaintiff's affirmation.

Young testified that he had known this engine a long time when she was in the service of the P. B. & W. R. Co., and that she was built in 1881. She was purchased from that company for defendant by Mr. Strathner, who was defendant's Master Mechanic at the time of trial also, but he was not produced as a witness. Upon a review of the whole situation we cannot doubt the refusal to strike out this testimony was correct. This brings us to the ruling on the prayers of which the plaintiff offered three, and the defendant thirteen.

The plaintiff's first prayer was refused, and is not in the record, and his second and third were granted, the defendant's special exceptions thereto being overruled.

The defendant's sixth, eighth and twelfth prayers were granted, and its first, second, third, fourth, fifth, seventh, ninth, tenth, eleventh and thirteenth were refused, and the defendant excepted to the overruling of its special exceptions to plaintiff's second and third prayers, and to the granting of these prayers, and also to the rejection of its own refused prayers. We are told in the plaintiff's brief that his first prayer was founded on the doctrine of *res ipsa loquitur,* but that prayer is not before this Court.

The defendant's first and second prayers asked the Court to instruct the jury that the plaintiff could not recover under the pleadings and evidence..

The defendant's tenth and eleventh prayers attempt to recite the evidence *as undisputed,* and assert that the verdict *must be* for the defendant under the pleadings and evidence, thus withdrawing the case from the jury.

If the first count in this declaration, which charges negligence in the selection and retention of reasonably competent co-employees, were the only count in the declaration, this question would be raised, but the second count charges negligence in failing to provide proper tools and equipment, and the third count charges negligence in failing to properly inspect its equipment. The tenth and eleventh prayers should have been confined to the first count. Moreover both these prayers are defective in assuming facts which it was for the jury to find. The tenth prayer asserts that Engine No. 1, when placed on the side track on Aug. 6th, was *"in good condition,"* whereas there was evidence tending to show it was not in good condition. The eleventh prayer asserts that "there was no evidence to show that Engine No. 1 was defective in such a way that she could start off, in the condition and under the circumstances in which she was placed on the track by Exeter." We think, notwithstanding Exeter's testimony on that point, that it was still a question for the jury whether the actual starting, which was proved, was due to the negligence of the defendant either in the original purchase of a defective engine, in the failure to make proper inspection, or to keep a proper watch on the engine while standing on the track, and these prayers were in our opinion properly rejected.

The defendant relies chiefly to sustain its first and second prayers upon the language adopted in *South Balto. Car Works* v. *Schaeffer,* 96 Md. 105, where there was merely a sudden and unexplained breaking of a piece of machinery, and the Court held that in an action by a servant against the master this did not justify the presumption of negligence on the master's part, *"when there is no evidence that defects in it could have been discovered by inspection, or that due care had not been exercised in its selection."* And the Court said:

"To punish the defendant because it cannot explain the cause
of the break, is not to punish it because it has done wrong,
but because it does not know what we wish to find out." But
in the case before us the plaintiff had offered evidence tend-
ing to show a defect, which if it existed when the engine was
purchased, could have been discovered by a proper examina-
tion, or which if it was brought about after the purchase,
could have been discovered by any proper system of inspec-
tion. In *Moran's Case,* 44 Md. 283, where an employee was
injured by an explosion occasioned by the defective and worn
out condition of the boiler the master was held liable for the
negligence of its master mechanic to whom had been dele-
gated the power to select and purchase the engine. Strathner,
in that capacity, purchased this engine, and he was not called
to state what examination, if any, he made by which the de-
fect, if it then existed, could have been discovered, though
it had been purchased only about two or three months before,
and there was testimony that she was at least 24 years old.
Exeter himself testified that she was "very old." John F.
Hess, an extra machinist of defendant, testified that she was
an old engine of a type operated many years ago on the P.
B. & W. R. R., and he also testified that the leaking of the
throttle might start an engine "because the escape from the
steam through the lubricator in such case could gain access
to the cylinder." This was in direct conflict with Exeter's
testimony on that point.

In *Crawford* v. *United Railways,* 101 Md. 417, this Court
said: "It is not enough that the master employs competent
servants.   *   *   *   He must exercise reasonable care and
supervision over them and see that they do their duty. And
when the business of the master is such that the safety of one
servant depends upon the way in which other servants do
their work, it is the duty of the master to *adopt, promulgate,
and enforce* reasonable and sufficient rules to protect and pro-
mote the safety of its employees exposed to danger." There is
no evidence of any *system* of rules here either for inspection

of engines or for their safe custody while under steam on a side track.

This case has its parallel in the case of *Lafferty* v. *Southern Pac. R. W.,* 15 U. S. Appeals, 195, where a brakeman was killed in a collision with another engine of defendant which in some unexplained way escaped from a side track to the main track, but the present case is stronger because of the evidence of a defect which might have caused the engine to start.　The Court said that if live engines, "if put in motion of themselves, or by the act of careless, thoughtless, or evil disposed persons," should escape on the main track, "they would in the very nature of things expose to unusual peril and hazard all the employees of the company in charge of other engines and cars upon the main track, and that it was for the jury to determine as a question of fact whether the employment of Riley as a watchman, *with the additional duties imposed upon him,* was a reasonable precaution upon the part of the company."　The evidence in this case is that the hostler who acted as watchman of the engines had other numerous duties assigned him, and in *Lafferty's Case, supra,* the Court left it to the jury to determine whether one man, no matter how competent, careful, and trustworthy, could properly guard the two engines spoken of in that case while performing the duty of wiping them and putting them in order.

A very strong and well reasoned case is referred to in *Lafferty's Case, supra,* viz, *Smith* v. *N. Y., Susq. & West. R. Co.,* 46 N. J. Law, 7, where a railway company was held liable for injuries caused by a collision resulting from the movement of certain cars which had been left on a siding in such a situation that a wrongdoer could readily throw them on the main line.　It is true that the action in that case was by a passenger, but while recognizing the general distinction, the Court in *Lafferty's Case,* found the citation in point; in that case the R. R. Co. left a loaded car coupled with two empty cars, at a safe distance on a siding inclined towards the main track with the brakes all set, and a railroad tie

324        MD., D. & V. R. CO. vs. BROWN.

Opinion of the Court.                    [109

placed beneath the wheels of the loaded car. These cars got upon the main track but there was no direct evidence as to what caused them to move.

In the case before us the grade was up from the side track, but the engine was under steam and able to move up grade. In the *Smith Case,* CHIEF JUSTICE BEASLEY was asked to charge, "that if the jury are satisfied from the evidence that on Sunday evening, the stone car with which the passenger car afterwards came into collision on that evening, had been made fast by means of a bar and brakes, at a safe distance from the main track, and incapable of motion towards the same, without the removal of the bar and brakes, and the application of external force, and there was no want of due diligence in stopping the train, then the defendant is not guilty of negligence, and there can be no recovery." Also he was requested to charge "that when an obstruction is placed upon a railway by a stranger, by accident or design the company is not liable for the consequences, unless its agents have been remiss in not discovering it." He refused both instructions and sent the case to the jury, giving as his reason therefor that "each of them, if adopted, committed the Court to the doctrine that the action could not be supported if the cars in question were so securely fastened, that but for the intervention of extraneous force they would not have got upon the main track, or if that, they would not have done so without the unlawful action of human agency * * * such a question is essentialy one for the jury. The judge could not be properly called upon to pass any opinion as to the sufficiency of the means employed, nor that such means were legal if they would have held the cars in position, without the application of external force."

Upon these principles and authorities we think the defendant's first and second prayers were properly refused. The plaintiff's second prayer required the jury to find that engine No. 1 was unsafe and unfit for the uses to which it was applied by the defendant under all the evidence, and that the plaintiff was not guilty of any want of due care on his part,

and embraced all the other requisites of recovery. The special exception thereto for the want of evidence that it was unsafe and unfit for the uses to which it was applied, was properly overruled and the prayer was properly granted.

The plaintiff's third prayer was the usual damage prayer, and it follows from what we have said in discussing the second, third and fourth exceptions that the special exception thereto on the ground that there was no evidence to sustain it, was properly overruled, and that the prayer was properly granted.

The defendant's sixth prayer, which was granted, gave it the benefit of the defence of a latent defect in the engine not discoverable by any reasonable or ordinary inspection. Its eighth, which was granted, gave it the benefit of the theory of inevitable accident, and its twelfth which was also granted, instructed the jury properly that the company was not an insurer of the lives or limbs of its employees, and was only bound for ordinary care for their protection. It also instructed the jury that the plaintiff assumed all risks ordinarily incident to the business *as conducted by the defendant.* We have already intimated that this proposition is too loosely stated and we must not be understood as sanctioning it.

The defendant's third prayer wholly ignored the alleged defect in the engine as a possible cause of its escaping and was properly refused. From what we have said in discussing the defendant's first and second prayers, it follows that the defendant's fifth prayer was properly refused. Its seventh prayer ignored the non-delegable duty to provide safe tools and equipment, and if granted must have misled the jury. The defendant's ninth prayer was fully covered by the granted sixth prayer, and there was no error in refusing it.

The defendant's thirteenth prayer is in part the same as the twelfth, but it also instructed the jury that if they found Exeter placed the engine on the side track in the manner testified to by him and left her in that condition, on an up grade, and that she could only get on the main track by running through two switches, then their verdict must be for the

defendant unless they found sufficient hostlers were not supplied to watch said engine. That ignores the evidence as to the defective throttle, as well as the theory of the application of external force starting the engine, and it would have been error to grant it.

. The defendant's fourth prayer is based on the theory that if the plaintiff knew of the alleged defect in the engine the day that he ran her, and notwithstanding such knowledge continued in the service of defendant until the accident happened, then he was not entitled to recover. He could however well assume that such a patent defect would be discovered under any reasonable system of inspection, and would be remedied promptly. The prayer should have required the jury to find that he knew such defect continued to the day of the accident. Had he himself used this engine at the time of the accident without examining to see if the defect still existed, and had been injured in consequence, there might be some ground for the granting of a prayer going to the extent we have suggested. But we are not prepared to extend the principle invoked to the facts of this case. .

We shall request the reporter to set out all the prayers in the case, that there may be no misapprehension as to their disposition.

We think the granted prayers gave the defendant all to which it was entitled, that the case was fully and fairly presented by them to the jury.

*Judgment affirmed with costs to the appellee above and below.*   .