## PEOPLE'S DRUG STORES, INC., *v.* MOWATT WINDHAM

[No. 24, April Term, 1940.]

174

*Decided April 19th, 1940.*

176

[redacted]

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, and DELAPLAINE, JJ.

*Walter L. Clark* and *Roszel C. Thomsen,* with whom were *Norman B. Frost* and *Thomas M. Anderson* on the brief, for the appellant.

*L. Vernon Miller* and *G. Van Velsor Wolf,* with whom were *Albert M. Bouic* and *William V. Bouic* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The Rockville Pike is a three-lane state road connecting Rockville, Maryland, and the City of Washington. At Corby's Hill, about three miles north of Bethesda and about ten miles from Washington, the travelled surface of the road is about thirty feet wide, a twenty-two foot macadam center bordered on each side by a four foot concrete shoulder. Going south from Corby's entrance at the top of the hill the road slopes down for eight hundred feet at a 5% grade, from that point south for three hundred and seventy-five feet at a 2% grade, then for three hundred and twenty-five feet at a 3.3% grade and finally for three hundred feet at a 5% grade. About eleven hundred and thirty-five feet from the top of the hill the road curves to the south and west, and on the west or inside of that curve there is a guard rail. On the side of the road, about one thousand feet south of the top of the hill, there is a route sign bearing the legend "U. S. 240."

At about two thirty o'clock in the afternoon of June 1st, 1938, Harry C. Wayland was driving a Plymouth automobile south on that road. When he reached the top

of Corby's Hill he saw a cloud of smoke which came from a pile of hay burning in a field on the west side of the road, blowing across the road about a quarter of a mile ahead of him. When he reached the smoke he found that it was quite dense and screened the road in front of him. He reduced his speed, drove carefully and slowly through the smoke screen, which was about fifty feet wide, and as he was proceeding, a Chevrolet car driven by a Mr. Willey, also proceeding south through the smoke, bumped into Wayland's car, doing some slight damage. Wayland drove beyond the smoke, parked his automobile, and went back to learn whether Willey needed help. He found the right front fender of the Chevrolet bent down on the wheel, and binding it so that the wheel would not turn freely. The Chevrolet was then standing with its right wheels on the dirt road at the right or west of the concrete shoulder. While those two cars were in that position, Mowatt Windham, driving north from Washington, also approached the smoke screen, and saw the two standing cars. He drove carefully beyond the smoke, parked his car, and came back to see whether he could be of help. He found Willey trying to start the Chevrolet, and he then went to the front of the car and tried to lift the right front fender from the wheel.

While he was in that position, Frederick W. Sherman, driving a tractor and trailer truck owned by the People's Drug Stores, Inc., going south, went through the smoke, struck the Chevrolet car, went on and struck the Plymouth car, and then went through a gap in the guardrail about three hundred feet into a field west of the road. When the truck struck the Chevrolet the impact threw Willey from the car, and threw Windham over the fence and into the field. As a result of the collision Windham suffered severe, permanent, and disabling injuries. Later he brought this action against the People's Drug Stores, Inc., to recover compensation for his injuries on the theory that they had been caused by the negligence of defendant's servant and agent, Frederick W. Sherman.

The trial resulted in a verdict and judgment for the plaintiff and this appeal is from that judgment.

The record submits three exceptions; two relate to rulings on the evidence and one to the rulings on the prayers.

Following are facts which, in addition to those stated, the jury could have found from the evidence: The length of defendant's combined tractor and trailer truck was about twenty seven feet, it was eleven feet and three inches high, the cab about five feet wide, and the complete vehicle weighed 17,270 pounds empty, and at the time of the accident it was driven at a speed estimated at from twenty to sixty miles an hour. When it struck the Chevrolet, the impact threw Windham about as high as the telegraph wire, drove the Chevrolet about thirty feet forward, and when it struck the Plymouth it drove it down the road and rolled it over and over.

At the time of the accident a gentle west wind drove the smoke from the burning hay east across the road, forming a smoke screen said to have been about fifty feet wide and forty or fifty feet high, varying in density and opacity, and irregular in outline. It was possible for one approaching the smoke from the north, by looking along the chord of the curve, to see cars south of it.

The noise of the collision between the Chevrolet car and the Plymouth attracted the attention of Franklin E. Rothwell and Robert E. Rothwell, father and son, who were doing masonry work on the Corby property nearby, and they at once ran to the scene of the accident. As they reached the route sign, they heard the truck coming and to quote the elder Rothwell: "I raised my hands. I was in white overalls which is conspicuous to any driver on the road. I waved my hands to try to slow him down. My son grabbed me and said 'Look out, the damn fool will run over you.' The truck came right along on the shoulder, just skipped me, I believe if my son hadn't pulled me I would have got hit. I could look right across the smoke as there is a bend in the road, and I could see the tops of like two cars, and just no more than

you could turn around I heard this crash and saw parts of a lot of things go in the air and I saw the man go up close to the top of this wire I described on this telephone pole. It must have been a telephone cable. The man went up near that, in the air. My son and I, we ran down there, and as we got there I saw these cars demolished. One car had turned over." The hay, he said, was in Mrs. Corby's field, some of the bales had been "split open, and some that had not been split open were laid in there, and all those were burned up."

The Rothwells first saw the truck "almost at the top of Corby's Hill," and it was continuously in their sight from that time until it disappeared in the smoke. The elder Rothwell had driven an automobile since nineteen sixteen, and made several experiments in "judging speeding." The younger Rothwell had driven automobiles for about five years and had often driven trucks. They were each asked to estimate the speed of the truck. The elder Rothwell said that it was proceeding at between fifty and sixty miles and hour, the younger Rothwell placed its speed at "at least fifty miles an hour." Objections to those questions were overruled and those rulings are the subject of the first and second exceptions.

The questions were inartificial, in that they did not direct the witnesses' attention to the speed of the truck when it disappeared in the smoke, but that defect was unimportant, since it appeared from their testimony that as they observed it the speed of the truck was uniform during the time it was in their sight.

Any sensory estimate of the speed of a moving object must be based upon experience, observation, and judgment, is necessarily approximate and empirical, its accuracy is rarely susceptible of complete demonstration, and its value must be measured by its consistency with known physical laws. It is but a mental impression formed instantly from the observation of conditions which may not be exactly reproduced and which ordinarily disappear instantly. The formation of such an opinion does not necessarily require special study, training, or

skill, and if it relates to a matter within the common observation of men in the every day affairs of life, the opinion of a lay witness of ordinary intelligence, in the full possession of his senses, who has observed the object and conditions to which the opinion relates, and whose experience in forming such estimates under like conditions has been such as should enable an ordinarily intelligent person to form such an opinion, should be admitted in evidence.

So it is said: "An estimate of the speed at which an automobile, locomotive, or other object was moving at a given time is generally viewed as a matter of common observation rather than expert opinion, and it is accordingly well settled that any person of ordinary ability and intelligence having the means or opportunity of observation is competent to testify to the rate of speed of such a moving object. Such characterizations as 'fast,' 'at a high rate of speed,' 'going fast,' etc., have been held proper. It should be noticed, however, that the supposition that speed is not a matter of expert opinion does not mean that experts cannot testify as to it, but merely that when they do their testimony is received, not as an exception to the opinion evidence rule made in cases of expert evidence, but under the exception existing in the case of impossibility of reproducing data." 5 *Am. Jur.* 860; 70 *A. L. R.* 540; 94 *A. L. R.* 1190; *Berry on Automobiles*, secs. 1272, 1273.

The reason for the rule thus stated is the difficulty, often the impossibility, of reproducing the conditions to which the opinion relates, since once the moment of observation has passed the circumstances affecting it at that time are often but a memory. The condition of the object, its appearance, the sounds accompanying its passage, the intangible impressions left upon the mind of an observer by the conditions affecting his judgment, can rarely if, ever be exactly reproduced. *Baltimore & Yorktown Turnpike R. Co. v. Leonhardt,* 66 Md. 70, 78, 5 A. 346; *Baltimore & Yorktown Turnpike Co. v. Crowther,* 63 Md. 558, 1 A. 279; *Everly v. Baker,* 168 Md. 599, 612,

178 A. 691. So that where the facts which form the basis of a conclusion cannot be adequately exhibited to the jury, the estimate of them made by a witness who observed them may be evidence. *Ibid;* 5 *Am. Jur.* 675, 20 *Am. Jur.* 640. So it has been said: "The broad general principle which permits witnesses to express opinions upon non-technical subjects because of the impossibility or the difficulty of reproducing data is perhaps most frequently applied where witnesses are called upon to make estimates of speed; distances, such as the distance between two points, the distance covered by a train, or the distance within which a train, street car, truck, automobile, or other moving object can be stopped; the height of an object above the ground; the degree of force in a particular situation, such as that produced by jars and jolts of railroad or street cars or by blows to an individual; the ability, capacity, or competency of persons; the possibility of a specified thing being done; the age of a person, area, dimensions, and size; elevation and grade; and other matters of like import. Testimony of a witness as to such matters can rarely be given with mathematical exactness; but the fact that the witness may give his testimony in form of an estimate or expression of opinion makes it no less admissible as direct evidence of an observed fact." *Ibid,* 675.

Accordingly, it is well settled that any witness qualified by observation and experience, expert or non-expert, may testify to the speed of a moving automobile which he has observed. 5 *Am. Jur.* 860; *United Rys. & Elec. Co. v. Ward,* 113 Md. 649, 77 A. 593; *Wash. B. & A. Elec. Ry. Co. v. Fingles, Inc.,* 135 Md. 574, 109 A. 431; *Hopper, McGaw & Co. v. Kelly,* 145 Md. 161, 125 A. 779; *Jackson v. Leach,* 160 Md. 139, 152 A. 813. It is suggested, however, that that rule does not permit a witness not an expert to estimate the speed of a moving automobile in miles per hour, and that contention is undoubtedly supported by the opinion in *State v. United Rys. Co.,* 139 Md. 306, 309, 115 A. 109, which cites *Mantik's* case (*United Rys. & Electric Co. v. Mantik*), 127 Md. 198, 205, 96 A.

261. The point considered in the *Mantik* case was not the admissibility of an estimate of the speed at which an automobile was moving in miles per hour, but the admissibility of an estimate of its speed in any form, but the statement in *State v. United Rys. Co.*, that a witness could not fix the speed of a moving automobile "as so much per hour," "without having shown some special knowledge which would enable him to speak as an expert," was quoted with apparent approval in *Hopper, McGaw & Co. v. Kelly, supra,* and is the law of this state, although contrary to the weight of opinion elsewhere. *Seager v. Foster,* 185 Iowa. 32, 169 N. W. 681; 70 *A. L. R.* 540; 94 *A. L. R.* 1190. See also *Waltring v. James,* 136 Md. 406, 111 A. 125.

But it is obvious that in using the term "expert" in *State v. United Rys. Co., supra,* the court did not have in mind only a person who had specially trained himself by study and observation to estimate the speed of moving objects, but rather any one who had, by actual personal experience, become familiar with the operation and speed of automobiles, whether his knowledge was gained through the personal operation of automobiles for business, or for pleasure, or as a traffic officer, or through experience in estimating the speed of moving automobiles operated by others (*Hopper, McGaw & Co. v. Kelly, supra*), for in the operation of an automobile over public highways for any purpose the driver must, to obey the traffic laws, constantly note its speed, and as well the speed of other automobiles which pass it, or which it passes, in terms of miles per hour, and so gain experience which should qualify him to estimate in such terms the speed of a moving automobile which he has observed. And ordinarily such evidence is not only the best but the only evidence available.

Such an estimate is necessarily approximate and not exact, for without mechanical aids it is manifestly impossible for any one, expert or non-expert, to estimate precisely the speed of a moving object, and that fact is assumed by every one possessing ordinary common sense.

Turning to the two questions under consideration, it is apparent, without further discussion, that they were in proper form, and that the witnesses were qualified by both experience and observation to answer them. So there was no error in the rulings involved in the first and second exceptions.

The plaintiff offered a damage prayer which was granted. The defendant offered three prayers, A. B, and C, praying the court to direct a verdict for the defendant, and ten jury prayers. The A, B and C prayers were refused and the first, second, third, fourth, sixth and eighth were granted as offered, the seventh and tenth modified and granted, and the fifth and ninth refused. The plaintiff excepted specially to defendant's sixth, seventh, eighth and tenth prayers, on various grounds, and these exceptions were overruled.

These rulings are the subject of the third exception. That the facts recited above are legally sufficient to support a finding of primary negligence is obvious and was not disputed in this court, but the defendant contends that the uncontradicted evidence shows as a matter of law that the plaintiff's own negligence directly contributed to the accident, or, that he voluntarily assumed the risk of its occurrence and that therefore either his B or C prayer should have been granted.

If the evidence showed that the plaintiff voluntarily and without any legal or moral compulsion assumed a position on a much traveled public highway in a cloud of smoke so dense as to prevent the drivers of vehicles using that road from discovering his presence, there would undoubtedly be force in that contention. But the facts of the case do not square with that hypothesis.

Giving to the evidence the weight and significance required by a consideration of those prayers, it may be assumed that Windham discovered Willey in an automobile on a public highway directly in the path of all south bound traffic, in such a position that persons travelling over it in that direction could not because of the smoke screen discover his presence. Willey's situation was

therefore one of immediate and serious danger, he could not leave his automobile where it was without endangering others travelling over the highway, and he could not remain in it without endangering himself. Windham, knowing those facts, was under a moral, if not a legal duty (Code, art. 56, sec. 196), to attempt to rescue him from his perilous situation.

The mere fact that he left a position of safety in an honest and generous effort to perform that duty cannot be characterized as negligence in law. *Maryland Steel Co. v. Marney,* 88 Md. 482, 497, 42 A. 60; *American Express Co. v. Terry,* 126 Md. 254, 262, 94 A. 1026; *Eckert v. Long Island R. C.,* 43 N. Y. 502, 3 *Am. Rep.* 721; 45 *C. J.* 966. A decent and courageous attempt to discharge a high moral duty cannot be termed negligence, unless the actor's conduct exhibits such a reckless indifference to danger as to amount to "rashness entailing almost certain injury." *American Express Co. v. Terry, supra; Shearman & Redfield on Negligence,* secs. 85 c, 85 b.

Windham's action in going to the aid of Willey was not therefore in itself conclusive evidence of negligence, nor may such an inference be drawn from the manner in which he attempted to discharge the duty which he assumed.

When he left his car north of the smoke screen before he left to go through the smoke to help Willey he stopped three or four south bound cars and explained the situation to them and left them about fifty feet north of the smoke. When he reached the Willey car, about one hundred feet south of the smoke, he took a position in front of the right front fender of Willey's car on the dirt side road, entirely off the paved surface. He may reasonably have assumed, in view of the fact that he had left other motorists north of the smoke screen, (a) that the drivers of south bound cars would be warned of the danger, and (b) that with or without warning no one would drive through the smoke screen without exercising at least ordinary care to discover whether his progress would injure others who might be obscured by the smoke. He

was not obliged to anticipate that any one would be so utterly indifferent to the safety of others as to drive an eight or nine ton truck at fifty miles an hour through a smoke screen which entirely obscured the road ahead of him. The suggestion submitted by the appellant that a "driver is entitled to assume, in the absence of warning, that the way ahead is free from obstructions or dangers of any kind" is not only bad law but pointless when considered in connection with the facts of the case. The truck driver had two warnings, one that given by the smoke itself, the other that given by Rothwell, Senior, who not only warned him but narrowly escaped death or severe injury in doing so.

One who operates a motor vehicle on a public highway must anticipate the presence of others thereon, and must exercise constant viligance to avoid injuring them, and if his view is obstructed by smoke, fog, rain, snow, sleet, or other atmospheric conditions, he must so operate it as to be able, by the exercise of reasonable care, to avoid injuring others, themselves in the exercise of ordinary care. It is said in 5 *Am. Jur.* 653, that: "The driver of an automobile whose vision is obscured by dust, smoke, or atmospheric conditions, such as fog, snow or heavy rain, must exercise care commensurate with the situation. The degree of care varies with the conditions creating the the obstructed vision, the roadway, and traffic conditions. The driver may be required to slow up. It has been asserted that a driver of a motor truck on a public highway who voluntarily turns his vehicle from the right-hand side of the road to the left, where vehicles going in the opposite directions are expected to travel, at a time when he cannot see the road for dust, without giving a reasonable warning signal, is grossly negligent." That statement is not entirely accurate, since the "degree of care" does not vary, but the precautions necessary to comply with the requirements of due care vary. But apart from that the statement is a clear and sensible exposition of the rule. 37 *A. L. R.* 582; 73 *A. L. R.* 1017; 48 *L. R. A. N. S.* 827; *State v. Hopkins*, 173 Md. 321,

326, 196 A. 91; *Edwards v. State, use of Guy,* 166 Md. 217, 170 A. 761; *Vizzini v. Dopkin,* 176 Md. 639, 6 A. 2nd 637. Certainly a blind man should not be permitted to drive so dangerous a machine as an automobile on the public highways, and yet one who has normal vision but fails to use it is in no better case.

Applying the rule recently stated in *Dashiell v. Moore,* 177 Md. 657, 11 A. 2nd 640, of this court, the plaintiff cannot be said to have been guilty of negligence as a matter of law.

Nor can it be said that he assumed the risk of defendant's negligence. The doctrines of assumed risk and contributory negligence are closely allied, but they are not the same thing. The doctrine of assumed risk implies intentional exposure to a known danger, which may or may not be true of contributory negligence. As stated in *A. L. I. Restatement of Torts,* sec. 893: "A person who knows that another has created a danger or is doing a dangerous act or that the land or chattels of another are dangerous, and who nevertheless chooses to enter upon or to remain within or permit his things to remain within the area of risk is not entitled to recover for harm unintentionally caused to him or his things by the other's conduct or by the condition of the premises, except where the other's conduct constitutes a breach of duty to him or to a third person and has created a situation in which it is reasonably necessary to undergo a risk in order to protect a right or avert a harm." An application of that rule to facts somewhat analogous to those involved in this case is found in Illustration 9 to Comment C. of that section. The doctrine, literally, is not applicable to such a case as this, because here there was no contractual relation between the parties, but this case falls rather within the doctrine of incurred risk, which is derived from the maxim that *"Volenti non fit injuria."* But under neither doctrine was the plaintiff required to anticipate that he would be exposed to a hazard not naturally incidental to his situation, but arising from negligence which he had no reason to foresee. *O'Malley v. Smith Boston Gas Light*

*Co.,* 158 Mass. 135, 32 N. E. 1119; 47 *L. R. A.* 161; 19 *A. L. R.* 4; *Wood v. Heiges,* 83 Md. 257, 34 A. 872; *Maryland, Delaware & Virginia R. Co. v. Brown,* 109 Md. 304, 81 A. 1005; 28 *L. R. A. N. S.,* 1220.

In this case, when Windham was standing in front of Willey's automobile, there was no apparent danger in his position, he should have assumed that south bound motor vehicles might come through the smoke, but he was not obliged to anticipate that a heavy truck would be driven through it so fast that it could not be stopped before striking the Chevrolet. So that he was not barred from recovery by contributory negligence, by assumed risk, or by incurred risk, and defendant's A, B, and C prayers were properly refused.

Defendant's fifth prayer stated (a) that it was the duty of the "operator" of a motor vehicle standing on a public highway obscured by smoke to warn overtaking motorists of its presence, and (b) that in the absence of such warning the overtaking motorist would be entitled to assume that the way was unobstructed and free from danger. The prayer was properly refused for a variety of reasons, (1) the "operator" of the car was not a party to the action, (2) if his peril was caused by his own negligence, it was peril none the less, and that it was due to his fault did not affect Windham's duty to rescue him if he could, (3) if southbound traffic should have been warned, it was immaterial whether the warning was given by the "operator" or another, as long as it was given by somebody, (4) under no circumstances was the truck driver entitled to assume that the road ahead was unobstructed and free from danger.

The court's modification of defendant's seventh prayer, by approving that fallacy, stated the law more favorably to defendant's position than was justified by either reason or precedent, but the error certainly did not injure him and is not therefore reversible.

The court also modified defendant's ninth prayer, which would have instructed the jury that if any negligence of the plaintiff directly contributed to his injury,

such negligence would bar recovery, by inserting after the word "negligent" the words "in any degree." The modification was unnecessary, but again it helped rather than hurt the defendant.

Defendant's ninth prayer would have instructed the jury that if plaintiff's injuries were caused by an unavoidable accident, unmixed with negligence on the part of the defendant's driver or the plaintiff, the plaintiff could not recover. While there are cases in which a properly drawn prayer presenting the theory of an unavoidable accident may be appropriate, there are others in which it would be very misleading. In this case it would be a pure abstraction. Sherman said that when he entered the smoke he was driving at from twenty to twenty five miles an hour, that at that speed he could stop the truck in thirty five feet, and that although he was looking straight ahead he did not see the Chevrolet until he was about eight feet from it. In other words, at the speed at which he was driving, he could not stop the truck until it had gone over four times as far as he could see. Since he could have avoided the accident by driving at a speed which would have permitted him to stop within the range of his vision, it cannot be said that as to him the accident was unavoidable. Nor is it apparent that the plaintiff could have avoided it. He was in no position to assist Willey and warn Sherman at the same time, he was off the paved surface of the road, and the smoke itself was sufficient warning to put Sherman on notice that he should exercise unusual care and diligence in driving through it.

Judge Sloan, speaking for this court in *Vizzini v. Dopkin,* 176 Md. 659, 6 A 2nd 637, after a careful analysis of the cases, stated the conclusion that even where such a prayer is appropriate, it would be misleading unless it defined "unavoidable accident," which this prayer does not do. There was therefore no error in its refusal. Because of those conclusions plaintiff's special exceptions need not be considered.

Finding no reversible error in the rulings involved in the exceptions, the judgment from which the appeal was taken, will be affirmed.

*Judgment affirmed, with costs.*