**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee**

v.

**GENOUS CAINES, Appellant**

No. 74-1757

United States Court of Appeals

Third Circuit

Argued December 6, 1974

Filed March 6, 1975

J. MICHAEL SPENCER, ESQ., Frederiksted, St. Croix, V.I., *for appellant*

JOHN S. WILBUR, JR., ESQ., Assistant United States Attorney, St. Croix, V.I., *for appellee*

Before SEITZ, *Chief Judge,* and VAN DUSEN and ROSENN, *Circuit Judges*

OPINION OF THE COURT

VAN DUSEN, *Circuit Judge*

Appellant contends that the July 19, 1974, judgment and commitment entered on the jury verdict finding defendant guilty of violating 20 V.I.C. § 504,[1] must be vacated because

---

[1] 20 V.I.C. § 504 contains, inter alia, this language:
    "When the death of a person ensues within one year as a proximate result of injury received . . . by the operation of any vehicle in a reckless

(1) it is based on insufficient evidence, and (2) the receipt of inadmissible evidence of speed requires at the least a new trial. After careful consideration of the record before the district court, we reject both contentions and affirm the district court judgment.

The facts surrounding this tragic homicide, occurring about 8 P.M. on Sunday, May 12, 1974, on St. Croix, U.S. Virgin Islands, are disclosed in the evidence, considered in the light most favorable to the verdict, as follows: Defendant Genous Caines[2] was driving a 1969 Pontiac Ventura west on the main highway of St. Croix, called Centerline Road, which is a blacktopped, two-lane highway running in a straight east-west direction for several miles and having a speed limit of 40 m.p.h. At this approximate time, Wilfred Allick, a passenger in another car, was being driven east from the town of Frederiksted to his home near Centerline Road.[3] When the car containing Mr. Allick came to the vicinity of his house, it pulled off to the lefthand shoulder on the north side of the road.[4] Mr. Allick was seen emerging on the lefthand side of the car, waiting for the car to continue proceeding easterly, and beginning to cross the road, going from north to south. N.T. 44. In the near vicinity was a street light illuminating the road area in which Mr. Allick was walking. N.T. 44. Mr. Allick was observed by a Mr. and Mrs. Garnet, who were driving west to east

---

manner or with disregard for the safety of others, the persons so operating such vehicle shall be guilty of negligent homicide by means of a motor vehicle."

The information charged that "Genous Caines did cause the death of one Wilfred Elisha Allick a human being by operating a motor vehicle in a reckless manner with disregard for the safety of others; . . . ."

[2] The defendant, a taxicab driver, was not on duty at the time of the accident.

[3] An autopsy found that Mr. Allick's blood alcohol level at the time of his death was .22%, a relatively high level of intoxication. N.T. 37–38. This fact, of course, does not preclude the jury from finding that the defendant's manner of driving was criminally negligent.

[4] In the Virgin Islands, one drives on the lefthand side of the road.

behind the car which had carried Mr. Allick. N.T. 43. About the time when Mr. Allick was seen by Mr. and Mrs. Garnet as reaching the mid-line of the road and entering into the east-west lane, they could hear a car engine approaching like a "rumble" toward them and saw headlights "coming from the west." N.T. 46. This car seen by the Garnets was the 1969 Pontiac operated by defendant. N.T. 50. Mr. Allick had reached a point approximately in the center of the westbound lane when he was struck and killed by the appellant's vehicle. Mr. Garnet, who had been driving for eight years, estimated his own speed at 30 miles per hour and that of the defendant's car at approximately 70 miles per hour when it hit Mr. Allick's body, which flew up in the air. N.T. 45, 48, 66, 67. Mr. Allick's body then hit the windshield of defendant's car and rolled off to a stop on the shoulder of the westbound lane. Defendant returned to the scene and said to Mr. Garnet, "I didn't see the man." N.T. 50.

Dr. Glenn, a pathologist and the medical examiner for the St. Croix Department of Health and Department of Law, testified that his duties included the investigation of deaths of unknown origin, including any type of death not occurring within a medical institution such as "death on arrival cases." He stated that he had performed approximately 100 autopsies a year since 1957 and that he performed an autopsy on the body of Allick on the morning of May 14, 1974. His "external findings were basically those of severe and multiple injury involving almost the entire extent of the body, including the head right down to the feet and it consisted mainly of massive bruises, deep lacerations and multiple fractures of the bones, from the skull, chest, legs, arms and so forth" (N.T. 21). He testified that death resulted from several severe, multiple injuries and that each of at least four separate injuries could have

independently caused Allick's death.[5] Further, he testified as follows concerning Allick's injuries:

". . . from the type of injuries, they were very characteristic of automobile injuries.

.          .          .

"In this instance basically our findings are based on the body itself, not on an examination of the car or any truck or what have you, but the body itself. It was my impression that the body was struck from the front, just the front part of the body. One of the first injuries was the legs being struck, fractured, in a position that indicates he was struck from the front, the fractures being all displaced backwards, and then the other injuries due to the body being knocked, sometimes they fly over the car, sometimes they spin off to the side . . . .

.          .          .

". . . let's assume that you are going at a relatively slow speed, you knock down an animal or human being or what have you, the car is more likely to pass over the body and you have signs of tire marks and scraping of the skin and so forth. Higher speeds you strike an animal or human being, in most cases the body will fly away from the car from the severity of the impact and will go over the top or just spin off to one side of the car depending on whether it is a right or left bumper.

"But since the bumper is usually the first thing that hits anybody that is upright, the bumper lifts the leg off the pavement and throws the body over the top of the car. And it would be unusual for a very high speed car to pass over somebody if the person was to the right because the weight of the body is from your waist up.

"So since that is the heaviest part of the body and you are hitting the legs first, you tend to go over the top of a car. That is why you get very characteristic fractures usually at the knee level or slightly below the knee from the bumper impact." N.T. 33–36.

A witness, Mr. Joseph, observed Allick alight from the car on the north side of Centerline Road. Allick had started across the road when a car "struck the man. The man flew in the air. . . . After he fly in the air, he stay in the air a

---

[5] Head injuries, including concussion of the brain, chest injuries, massive internal and external hemorrhaging, and vascular shock. N.T. 29.

little while and hit him again in the windshield and knock in the windshield again and then roll off to the side" (N.T. 167).[6]

The appellant first contends that testimony as to speed introduced by the prosecution should not have been admitted, variously contending that the witnesses gave opinions without stating the facts on which the opinions were based; that the witnesses were never shown to have any ability to gauge the velocity of a car; and that the testimony was so "patently unreliable" as to be incompetent.

■ Ever since 1906, the rule in this Circuit has been as stated in this language of Porter v. Buckley, 147 F. 140, 141–42 (3d Cir. 1906):

"In Detroit & Milwaukee R.R. Co. v. Van Steinburg, 17 Mich. 104, Chief Justice Cooley, said:

'. . . Any intelligent man, who had been accustomed to observe moving objects, would be able to express an opinion of some value upon it the first time he saw a train in motion. The opinion might not be so accurate and reliable as that of one who had been accustomed to observe, with timepiece in hand, the motion of an object of such size and momentum; but this would only go to the weight of the testimony and not to its admissibility. Any man possessing a knowledge of time and of distances would be competent to express an opinion upon the subject.'

"Rogers on Expert Testimony (2d Ed.) p. 244 says:

'Questions as to the speed with which trains were moving are not, strictly speaking, scientific inquiries, but any man possessing a knowledge of time and distances is usually competent to express an opinion on that subject.'

"Lawson on Expert and Opinion Evidence (2d Ed.) p. 505, gives the following rule:

'The opinions of ordinary witnesses derived from observation are admissible in evidence when, from the nature of the subject under investigation, no better evidence can be obtained, or the facts cannot otherwise be presented to the tribunal, e.g., questions relating to

---

[6] Mr. Joseph's testimony that the car had "a lot of speed," N.T. 167, was stricken upon the objection of defense counsel, N.T. 170.

time, quantity, number, dimensions, height, speed, distance or the like.'

". . . Applying to the case in hand this rule, which we think is supported by the best authorities, we find that Mrs. Thomas testified that she had witnessed horse races and, on several occasions, had timed express trains running through Hackettstown and Rutherford, N.J., that she had never seen anything go so fast on the public highway as the defendant's automobile, and that she should judge it was going 'at the rate of 40 or 50 miles an hour as the express goes through town.' It thus appears that if it was necessary that her opinion concerning the speed of the automobile should be authenticated by proof that she had previously observed the speed of moving objects, that proof was furnished. The weight of her opinion was a question wholly for the jury."

Similarly, in Government of the Virgin Islands v. Rodriguez, 7 V.I. 355, 300 F.Supp. 909, 910 (D. V.I. 1969), Judge Maris stated that corroboration of evidence taken from a speedometer may be provided "by the opinion evidence of a police officer or other person as to the defendant's rate of speed if the witness first shows some experience in observing the rate of speed of moving objects or some other satisfactory basis for his opinion." See also Finnerty v. Darby, 391 Pa. 300, 138 A.2d 117 (1958); Peoples Drug Stores v. Windham, 178 Md. 172, 12 A.2d 532 (Md. 1940); 2 Wigmore on Evidence § 571 (3d ed. 1940); 7 id. § 1977.

Under these precedents, the district court properly admitted the testimony offered by the prosecution as to the defendant's speed. Mr. Garnet, a driver of eight years' experience, knew his own car's speed and was therefore in a good position to judge the speed of an oncoming car. He was able to put a figure on that speed, 70 m.p.h., but candidly admitted on re-cross-examination that this was an estimate of speed. N.T. 66, 69. To hold that his opinion as to speed was too unreliable to be admitted would in effect cancel all suits in which the plaintiff was required to prove the defendant's speed and where the defendant was not, at the time of the accident, being clocked by a bystander or

being tailed by the police. This the law does not require.

■ Mrs. Garnet's testimony that the defendant's car was "going very fast" is arguably subject to the defendant's objections that, not being a driver, she was not competent to give her opinion as to speed, and that her opinion— "very fast"—was too vague to be probative. See, e.g., Stearrett v. Syva, 285 A.2d 816, 818 (Del. Super. 1971). However, her testimony was merely cumulative and corroborated her husband's more experienced and precise testimony that the defendant was traveling at 70 m.p.h. For these reasons, we do not believe that the district court committed reversible error in allowing her testimony to go to the jury.

■ Further corroboration was provided by Dr. Glenn's detailed description of the injuries the deceased sustained, by witnesses' descriptions of the violence with which the deceased's body was struck by the car, and by photographs of the car admitted into evidence, which showed the extensive damage caused to the front of the car by the impact. The only evidence to the contrary is the defendant's own testimony that he was traveling at 45 m.p.h. N.T. 120. Considering all these factors together, there can be no doubt that the question of the defendant's speed was properly put to the jury through competent evidence adduced by the prosecution.[7]

The appellant's next contention is that, even if there was enough evidence for the jury to find that he was traveling at an excessive speed, such a finding is insufficient, as a matter of law, to convict on a charge of "reckless driving" or driving "with disregard for the safety of others."

■ Although we have found no decisions in this jurisdiction which we are directly on point, the weight of au-

[7] Receipt in evidence of Mrs. Martinez's testimony that she saw the defendant "pass [her] very fast" shortly before the collision as she drove west on Centerline Road was not reversible error. See Finnerty v. Darby, supra at 124; 2 Wigmore on Evidence § 382 (3d ed. 1940).

thority appears to be that other incriminating circumstances must be combined with excessive speed to sustain a charge of reckless driving. See Preston v. State, 56 So.2d 543 (Fla. 1952);[8] 7 Am. Jur. Automobiles and Highway Traffic § 281 (2d ed. 1963). But cf. Sheffield v. State, 90 So.2d 449 (Fla. 1956) (distinguishing Preston, supra); People v. Kelly, 70 Cal. App. 519, 234 P. 110 (1925). We believe, however, that the prosecution supplied ample evidence of the circumstances attendant on the defendant's speeding to support the jury's finding of criminal dereliction. Most important is the unchallengeable fact that three other persons, two of them in a moving vehicle and observing "from [a] distance," N.T. 43, had no difficulty in seeing the deceased cross the street, whereas Caines apparently never saw the deceased. Compare N.T. 43, 70, and 166–67 with N.T. 119. Also probative of the defendant's recklessness is the fact that the deceased crossed the road directly in front of Garnet, who did not hit him, or even indicate that he was forced to take evasive maneuvers to avoid hitting him. The defendant would also have had time in which to observe the deceased and, if necessary, to take precautions against a possible accident; yet the defendant struck the deceased without ever having seen him. These circumstances, combined with considerable evidence that the defendant was traveling approximately 30 m.p.h. in excess of the speed limit, thereby drastically decreasing his available time to see the deceased, are, we believe, sufficient to sustain the jury's conviction.

The July 19, 1974, judgment and commitment will be affirmed.

---

[8] While disclaiming any intent to rely on this ground, the court in Preston took pains to note that there was no evidence introduced to show that the collision in that case had caused the deceased's death. 56 So.2d at 544. It is obvious that in the case before us there could be no doubt that the deceased died as the direct result of being struck by the defendant's car.

ROSENN, *Circuit Judge*, Dissenting

Since this is a criminal case, the law imposes a more stringent burden of proof on the prosecution than it would impose, in the same circumstances, upon a plaintiff claiming negligence in a civil action. The prosecution must prove the defendant's guilt beyond a reasonable doubt. Although in this case the Government is entitled to the benefit of all reasonable inferences because it has a favorable verdict, I cannot agree that the prosecution has introduced sufficient evidence upon which a jury could convict the defendant.

The Government charges that the defendant caused the death of a person by operating a vehicle "in a reckless manner or with disregard for the safety of others." 20 V.I.C. § 504. We first must interpret this statutory standard against which the defendant's conduct is to be judged.

Reckless driving . . . connotes culpable or criminal negligence amounting to a careless disregard of the rights or safety of others "the consequences of which could reasonably have been foreseen by the driver . . . ."

Commonwealth v. Stephens, 179 Pa. Super. 255, 258, 115 A.2d 904, 905 (1955), quoting Commonwealth v. Forrey, 172 Pa. Super. 65, 68, 92 A.2d 233, 234 (1952). The word "reckless" in a statute providing for criminal liability has a clear and commonly understood meaning of something more than mere failure to exercise due care. People v. Bearden, 290 N.Y. 478, 49 N.E.2d 785, 787 (1943); Commonwealth v. Aurick, 342 Pa. 282, 288, 19 A.2d 920, 923–24 (1941); State v. Rachels, 218 S.C. 1, 61 S.E.2d 249, 252 (1950). Moreover, the driving of an automobile at a high rate of speed is insufficient by itself to support a conviction for "reckless driving"; other facts showing a reckless disregard of the consequences must be proven. State v. Andrews, 108 Conn. 209, 214, 142 A. 840, 841 (1928); People v. Grogan, 260 N.Y. 138, 144, 183 N.E. 273, 275 (1932).

In this case, the Government relied primarily on three pieces of evidence: (1) the testimony of Samuel Garnet, who estimated defendant's speed at 70 m.p.h., (2) the nature of the victim's injuries, and (3) the damage to the defendant's car.

I disagree with the majority that Garnet was "in a good position to judge the speed of the oncoming car" because he knew the speed of his own car. Since Garnet and the defendant were proceeding in opposite directions, an accurate estimate of speed would have been difficult at best even in daylight. Here, however, Garnet made his estimate at night. Moreover, no proof was offered concerning the length of time during which Garnet had an opportunity to observe defendant's car and form an opinion as to its speed. I therefore do not believe that Garnet's testimony concerning the speed of the defendant's car was competent, or if it was, that it is entitled to much weight in this criminal case.

The serious nature of the plaintiff's injuries adds little because a vehicle operated at a speed of 40 m.p.h., the speed limit on Centerline Road, or at 50 m.p.h., not necessarily a "reckless" rate of speed, might have inflicted similar injuries, depending upon the weight of the car and other physical facts. None of these have been established. The damage to defendant's car also might have been sustained at speeds of 40 or 50 m.p.h., again depending upon factors such as the weight of the victim, and the age, condition, and quality of the body of the defendant's car. The record is not helpful concerning any of these factors.

I believe the record simply contains insufficient evidence to sustain defendant's conviction. Entirely too many imponderables are present. Defendant, an experienced driver, was driving on a blacktopped, two-lane highway running in a straight east-west direction for several miles. Photographs entered in evidence indicate that the stretch of highway where the accident occurred is not densely populated.

535

The speed limit was 40 m.p.h. Only a street light "in the near vicinity" penetrated the darkness, and blacktopped highways are known for their inability to reflect light. The record does not establish the distance between the light and the point of contact with the victim, the candle power of the light, or the degree and area of illumination. The record also does not indicate whether the night was moonlit or dark.

On the other hand, the record does disclose circumstances which could have prevented defendant from seeing the victim, even if defendant had been driving at a speed of only 40 m.p.h. Defendant was driving east to west on the appropriate lefthand side of the highway. The victim was a passenger in a car proceeding in the opposite direction. When the victim alighted from the car on the north side of the highway, he waited for the car to proceed easterly and then started south across the road. Thus, while he was crossing the eastbound lane to the south side of the highway, he was concealed momentarily from the defendant's view by the car from which he had alighted and which was proceeding in the direction of the defendant. Additionally, since the victim was crossing the highway north to south and perpendicular to the route in which defendant was traveling, defendant in all probability could not have seen the victim until the victim entered the westbound lane and came within range of defendant's headlights. If the beam of the headlights was focused properly, it was directed toward the defendant's westbound lane only. Under these circumstances, a person operating a motor vehicle even at a relatively slow speed quite conceivably might not have seen a pedestrian crossing the highway until it was too late.

I would reverse the judgment and sentence of the district court with directions to enter a judgment of acquittal.