COASTAL TANK LINES. INC. *v.* KIEFER, ET AL.

[No. 40, October Term, 1949.]

84

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■    ■■■■

■■■■■■

*Decided December 8, 1949.*

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Frederick W. C. Webb* and *E. Dale Adkins, Jr.,* with whom were *Woodcock, Webb, Bounds & Travers* on the brief, for the appellant.

*John William Long,* with whom was *Curtis W. Long* on the brief, for the appellees.

MARBURY, C. J., delivered the opinion of the Court.

Appellees' car, husband driving, ran into the rear of appellant's oil truck, parked on public highway leading from Salisbury to Bard, Delaware. Both appellees were injured. The accident happened about 5:30 P. M. on December 23rd, 1947. Both appellees sued, the cases were consolidated, and in a trial before a jury each received a verdict for $2500. Appellant sought an instructed verdict in each case, and, failing in that, filed motions for judgment N. O. V. These were refused, judgments were entered on the verdicts, and these appeals were taken.

The questions raised by appellant are whether there was legally sufficient evidence of primary negligence on its part, and whether the evidence showed contributory negligence as a matter of law on the part of the appellee, Karl Joseph Kiefer.

Appellant's truck, loaded with 3980 gallons of kerosene, became disabled about nine miles east of Salisbury, due to a broken fuel pump. It came to rest 25 to 30 feet east of two lighted kerosene flares which had been placed on the road by the State Roads Commission to warn of uneven resurfacing. The driver, Smith, who was alone, became apprehensive that the flares might ignite the load he was carrying, and he moved his truck, by the use of his starter, as far as he could. He finally brought it to rest about ten or twelve feet further east, away from the flares, with its right wheels on the edge of the right hand side of the road. There was a ditch just off the road, and a grass shoulder two feet wide between the ditch and the paved surface. About ten feet of the paved surface was left open beyond the truck on the left side of the highway. If the heavily loaded truck had run on the shoulder, Smith said at the trial he was afraid he would be there yet, as the shoulder wouldn't hold it.

According to Smith's testimony, he then placed three metal and glass reflectors, of a kind approved for use by the Motor Vehicle Law, Code Supp. 1947, Art. 66½, § 1 et seq., one 40 paces to the rear of the truck in the center of the lane on which he was traveling, one 40 paces ahead of the disabled truck in the center of the same lane, and one about ten paces to the rear of the disabled truck, and on the center line of the highway. He then turned off his lights because of the danger of a short circuit, and a possible ignition of the highly inflammable cargo he was carrying. He said he did not think the Interstate Commerce Commission would allow his lights to be on under the circumstances. There is nothing in the record to show any such rule of the Interstate Commerce Commission. The truck, in addition, was equipped with four red reflectors on its rear. There is no con-

tradiction of this evidence as to the placing of reflectors, and they were all seen by different witnesses, although only one witness saw them all. Karl Kiefer, one of the plaintiffs, said that he did not see any reflectors before the accident, but after the accident he saw one lying down on the road to the left rear of his car, and subsequently, he said it was behind his car. A witness for the plaintiffs, who was driving a Red Star bus, passed the truck shortly before the accident happened. He saw it, and pulled around it after waiting for another car to go by. He did not see any lights or reflectors about the truck. He went on to Pittsville, and came back. When he arrived at the scene there were two cars there and Kiefer was lying in the road on his face. He picked Kiefer up and put him back in his car. At that time he saw a reflector lying down on the road by the rear wheel of the truck. He said that was the only one he saw, but he did not look for them. Another witness for the plaintiff, who arrived at the scene of the accident shortly after it occurred, said he saw a reflector lying just off from the back wheel of the truck turned on its side. He also said on cross examination that "It seems like to me there was two there." Another witness, who was coming the other way on the road and saw the accident happen, said there was a reflector on the road in front of the truck, about 100 feet, and he saw another reflector about 100 feet beyond the truck when he continued on his way to Salisbury after helping to pick up Kiefer. Another witness who arrived at the accident shortly after it occurred, going east from Salisbury, saw one of the reflectors about 100 feet before he got to the scene. He then pulled around the truck and saw a reflector about 100 feet in front of the truck. He also saw a third one lying beside the Kiefer car. Officer Sherwell, of the Maryland State Police, arrived at the scene of the accident shortly after he had received a call at Salisbury. He said he got there about 5:40. The first thing he noticed was a red reflector in the center of the road surface. He paced the distance and said it was 30 feet from the truck. He

saw two reflectors on the road back of the truck, one of them damaged, but did not remember whether or not the damaged one was nearer the truck than the other.

After the driver of the truck had placed these reflectors, and had extinguished the lights on the truck, he got a ride to the nearest telephone which was about two miles farther along the road. He there called the terminal for help, and then walked back to the truck. When he reached there the accident had happened.

The testimony of Karl Kiefer is that he lived in Pittsville and left Salisbury about ten after five when it was just dusk. He had his lights on, his wife was with him. He thought it was about twenty minutes to six when the accident happened. As he approached the place on the road where the truck was parked, he saw four cars approaching, dimmed his lights, and, just after he passed the first car he hit the truck in the rear. He was then driving between thirty and thirty-five miles an hour. He didn't see a reflector. The first thing he saw was a dark object in front of him which was the truck itself. He saw the reflector after the accident, lying down either to the left of the car or behind the car. He didn't feel anything, so he didn't think he had run over it. Mrs. Kiefer said she was looking straight ahead and did not see the truck before it was hit. She also said she saw no warning lights or reflectors.

The Motor Vehicle Law, Code Supp. 1947, Article 66½, sec. 218, provides that whenever a vehicle is parked or stops upon a roadway, whether attended or unattended, at a time when there is not sufficient daylight to render substantial objects clearly discernable at a distance of 300 feet ahead, such vehicle shall be equipped with one or more lamps which shall exhibit a white light visible to the front for a distance of 300 feet and a red light visible from a distance of 300 feet to the rear. However, Section 240, passed in 1943 by Chapter 1007, makes other provisions for trucks. They are required to carry not less than three flares or reflectors of a type approved by the Department of Motor Vehicles, and whenever one of

these vehicles or its lighting equipment is disabled, during the period when lighted lamps have to be displayed, and such vehicle cannot immediately be removed, the person in charge shall immediately cause the flares, lamps or other signals to be lighted and placed upon the highway, one at a distance of approximately 100 feet in advance of such vehicle, one at approximately a distance of 100 feet in the rear of such vehicle, and the third upon the roadway side of such vehicle, "except that if the vehicle is transporting inflammables, three brilliant red reflectors in lieu of other signals shall be placed adjacent to any such last mentioned vehicles." It appears from this section that a truck loaded with inflammables, as was the one in the case before us, is required by the statute to place reflectors in the respective positions mentioned instead of flares for the obvious reason that flares might ignite the cargo. These reflectors are stated to be "in lieu of other signals," and the question is does that mean in lieu only of the other signals mentioned to be placed around other disabled trucks, such as flares, lanterns, etc. or does it mean all other signals including the lights required to be on all vehicles by Section 218. We think the latter is the correct interpretation, because the statute provides that these other signals shall be placed under two circumstances, one where the *vehicle* is disabled and the other where *its lighting equipment* is disabled. The Legislature, therefore, felt that flares, or in the case of inflammable cargoes, reflectors, would give sufficient warning if the truck had no lights on it, when such lights were disabled. That is what is said by the statute, and it is apparent that it would be no more dangerous to leave a truck without lights, when the lights could be turned on, than it would be to leave a truck without lights when they could not be turned on. The danger would be the same in each case, and it is to be presumed that the Legislature considered this and decided that the flares or reflectors would give sufficient warning in either case as no distinction was made in the law. This view is strengthened upon further considera-

tion of the danger that might occur to passersby on the highway from a possible fire or explosion if inflammables caused by short circuiting, as Smith said he feared, or by some other result of leaving the lights burning when the vehicle was in some way disabled. The Legislature did not require the driver (even if he had sufficient knowledge) to determine whether there was danger from leaving his lights on, in any given case, because of the nature of the disablement of the truck. It adopted, in our opinion, what was probably a wiser course, by requiring the placing of the reflectors, and stating that these reflectors should be in lieu of every other kind of signal used in other cases to give warning to approaching vehicles.

In considering whether the case should be taken from the jury, it is a well known rule that we consider only testimony favorable to the plaintiff, and all reasonable inferences that can be drawn from it. We do not think, however, that there can be drawn from the testimony of either of the plaintiffs, or if their witnesses, any reasonable inference that the reflectors were not placed as stated by the driver. The most that can be said is that they were not *all* seen by the plaintiffs or their witnesses, although some of them saw *some* of the reflectors. There is no testimony by any of them that they looked for reflectors and did not see them. This is negative testimony, and does not lead to an inference that the reflectors were not there. We conclude that there is no inference, beyond speculation, that the jury could draw that reflectors were not placed properly on the road. We find, therefore, that in this respect there was no negligence on the part of appellant or its employee.

The appellees contend that the driver of the truck was negligent because he parked his truck on the paved part of the highway when he should have parked it off of this portion, under the provisions of Section 189 (a) of Article 66½. This section, however, only requires this to be done "when it is practical", and there is an exception in Section (b) for any disabled vehicle when it is im-

possible to avoid stopping and temporarily leaving such vehicle on the paved portion of the highway. The Legislature could not have intended the driver of a heavily loaded truck, such as the one in this case, to drive off on a grass shoulder which could not support the load and thereby mire his vehicle indefinitely, if it did not actually run into the ditch. We think the exception applied in this case.

Another contention that is made is that even if the driver placed the reflectors on the highway he did not place them adjacent to the truck in accordance with Section 240 above referred to. We think that "adjacent", as used in this section, means in the same position as the flares, the place of which the reflectors take where an inflammable cargo is being transported. If flares are required to be placed as provided in Section 240, and the positions of these flares are set out as we must assume, to produce the greatest amount of reasonable warning, then it is difficult to find any reason why reflectors, serving the same purpose, should not be likewise placed in the same positions.

A further charge of negligence is that the driver left the truck unattended for what the appellees claim was approximately three-quarters of an hour. It does not appear from the evidence that the driver unduly delayed his return after telephoning for help, and it is difficult to see what else he could have done but just what he did, that is, to proceed to the nearest place where he could get a telephone and then to walk back, in the absence of any other conveyance at his disposal. The fact that he said a word or two to two people on the way is certainly not sufficient to show that there was any negligence on his part. In any event, there is no requirement that the driver should remain by the truck to give any other signals than those the statute requires, and it would seem to be common sense to suppose that the best thing he could do would be to get help so that truck could be removed from the highway as soon as possible.

It is also contended that the driver was negligent because he did not park his truck so that at least twelve feet of the highway opposite it was clear and unobstructed as provided in Section 189(a). The evidence was that the unobstructed part was about ten feet. From the undisputed testimony it seems clear that this was best the driver could do, and in any event, he came within the exception in 189(b) which absolves him of having to do any of the things mentioned in 189(a).

We do not, therefore, find that there was any negligence on the part of the appellant or its agent, and since that is so, appellant was entitled to the instruction for a directed verdict for which it asked on the ground that it was guilty of no primary negligence, and was further entitled to judgments N. O. V. which were refused.

*Judgments reversed without a new trial, with costs to the appellant.*