WEISHAAR ET AL. *v.* CANESTRALE ET AL.

(Three Appeals in One Record)

[No. 171, September Term, 1965.]

678

*Decided March 11, 1966.*

The cause was argued before HAMMOND, HORNEY, OPPEN-HEIMER and McWILLIAMS, JJ., and RAINE, J., Associate Judge of the Third Judicial Circuit, specially assigned.

*J. Louis Boublitz,* with whom were *Ernest V. Wachs* and *Ready, Boublitz & Broadwater* on the brief, for the appellants.

*K. J. Mackley,* with whom were *Charles F. Wagaman, Paul Ottinger* and *Wagaman, Wagaman, Meyers & Hauver* on the brief, for the appellees.

McWILLIAMS, J., delivered the opinion of the Court.

These appeals were spawned on a foggy morning in March, 1964. Kaczmarek, driving Canestrale's truck, which was loaded with kitchen cabinets destined for College Park,[1] had reached a point on U. S. Route 40 A about 8 miles east of Hagerstown and some 1,000 feet from the summit of South Mountain, when the truck's engine, which earlier had evinced symptoms of malfunction, came to a complete stop.

The highway at this point is divided into three lanes, one for the downhill (westbound) traffic and two for the uphill (eastbound) traffic. The right uphill lane is for slow traffic, the left for faster traffic. Photographs in the record indicate the presence of a shoulder about six feet wide adjoining the slow lane. Kaczmarek, eastbound, had been moving uphill, in the slow lane.

---

1. College Park, Maryland is located in Prince George's County about 4 miles northwest of the District line.

Assisted by Michener, who was riding with him, Kaczmarek "drifted" the truck backwards "onto the shoulder." Michener "figured * * * [they] had about four and a half feet off of the road and four and a half feet on the road." Kaczmarek dismounted, opened the hood and attempted repairs. He got back into the truck and tried, without success, to start it. All lights were then turned off to conserve the battery. Although flares were in the truck no attempt was made to use them.

Meanwhile, Weishaar, also eastbound on U. S. 40 A, was on his way up the mountain. He had just delivered 6,000 gallons of fuel oil in Hagerstown and was on his way back to Baltimore. He said it was clear at the foot of the mountain but as he ascended he "could see this fog rolling in just like smoke." He kept on and after a while, about 50 feet away, he saw "a dark splotch through [the] fog which * * * [he] presumed was a slow moving truck." He did not attempt to pass on the left because a glance at the rear view mirror disclosed headlights behind him in the fast lane. He said he was unable to avoid striking the rear of Kaczmarek's truck. The impact was of such force that the Canestrale truck was tumbled over into the ditch bordering the dirt shoulder. Kaczmarek, Michener and Weishaar were injured, Weishaar's truck was damaged and Canestrale's truck was a total loss.

The trial resulted in judgments in favor of Canestrale ($2,-960) and Kaczmarek ($2,070) from which Weishaar has appealed. He has also appealed from the judgment in favor of Canestrale and Kaczmarek for costs in the counter claim filed by him. Canestrale's cross appeal is from the trial court's exclusion of evidence bearing on damages arising out of the loss of the cargo.

I.

Weishaar's first two contentions can be treated together. He says there is in the record no evidence upon which a jury could erect a finding that he was negligent. Moreover, he says, Kaczmarek was negligent as a matter of law. We do not agree with either contention.

The evidence abounds with instances of conflict and ambiguity. Weishaar said he was about 50 feet from Kaczmarek's truck when he first saw it and that he could not have seen it

sooner because of the fog. On the other hand Kaczmarek said he could see "pretty far up the road." Michener declared he could see "clear to the top of the mountain," a distance he estimated to be "about a thousand feet." Trooper Snyder, who investigated the accident, testified that when he arrived (about 25 minutes later) he could see "better than a hundred yards, a good hundred yards." Roy Harbaugh, who manages a towing service, said that, when he arrived "it was very visible." Trooper Smith traversed South Mountain, westbound, "a little just before eight o'clock." He said the Canestrale truck was parked with its right tires off the roadway and that he saw it as soon as he came across the top of the mountain, two-tenths of a mile away. It will be observed that Michener's estimate (1,000 feet) was about the same. Wayne Lutz, westbound, passed by while Kaczmarek was "drifting" the truck backwards. He said he could see 50 to 75 feet and that he could drive no faster than 20 miles per hour. Most of the witnesses described the situation as being alternately clear and foggy. One said it would "roll in and roll out." Others used the words "spotty" and "patchy."

Weishaar's speed prior to, and perhaps at the instant of, the collision was twenty-eight miles per hour. He so testified and his testimony was corroborated by the card removed from the Tachograph, a time-speed recording device which had been installed in his truck. Asked, on cross-examination, within what distance he could bring his truck to a stop he answered "roughly two hundred and fifty feet." Additionally pressed, still on cross-examination, he watered this down to "a hundred and fifty or two hundred feet." Also he admitted he could see "only fifty feet."

The determination of the limits of visibility at the time of the accident was an undertaking peculiarly within the province of a jury. The jury quite properly could have found that, during the 30 seconds just before the collision, Weishaar had a clear view ahead for a distance of 300 to 1,000 feet. Assuming such a finding, a simple and inexorable conclusion follows, namely, that Weishaar could have avoided the collision by stopping within the 250 feet he claims he required, and this provides a sound basis for a finding of primary negligence. *Ford*

*v. Bradford,* 213 Md. 534, 132 A. 2d 488 (1957) ; *Eisenhower v. Balto. Transit Co.,* 190 Md. 528, 59 A. 2d 313 (1948) ; *Robert v. Wells,* 170 Md. 367, 184 Atl. 923 (1936) ; *Transportation Co. v. Mumford,* 154 Md. 8, 139 Atl. 541 (1927).

To support a holding that Kaczmarek was guilty of negligence as a matter of law there must be found in the evidence some prominent and decisive act, or failure to act, which permits of but one interpretation and in regard to which there is no room for reasonable minds to differ. *Thomas v. Baltimore Transit Co.,* 211 Md. 262, 127 A. 2d 128 (1956) ; *Lindenberg v. Needles,* 203 Md. 8, 97 A. 2d 901 (1953) ; *Beck v. Baltimore Transit Co.,* 190 Md. 506, 58 A. 2d 909 (1948). Weishaar argues that parking the truck partly on the paved road and partly on the shoulder is such an act. A similar situation was presented in *Coastal Tank Lines, Inc. v. Kiefer,* 194 Md. 81, 69 A. 2d 790 (1949). In that case a truck loaded with kerosene became disabled because of a broken fuel pump. The driver, by making use of the starting motor was able to place the truck so that its right wheels were on the edge of the right hand side of the paved portion of the road. There was a grass shoulder two feet wide and next to the shoulder there was a ditch. The driver went off to get help and before he returned the plaintiff had collided with the rear of his truck. It was argued that this was negligent because Code, Art. 66½, § 244 (a) and (b) (1957) [then Art. 66½, § 189 (a) and (b) (Cum. Supp. 1947)] prohibits parking on the paved part of the highway. Since the wording of the statute remains unchanged, the language of Chief Judge Marbury, who wrote the Court's opinion, is generally applicable to the case at bar:

"* * * This section, however [§ 244] only requires this to be done [parking on the shoulder] 'when it is practical,' and there is an exception in Section (b) for any disabled vehicle when it is impossible to avoid stopping and temporarily leaving such vehicle on the paved portion of the highway. The Legislature could not have intended the driver of a heavily loaded truck, such as the one in this case, to drive off on a grass shoulder which could not support the load and thereby mire his vehicle indefinitely, if it did not actually run into the ditch. * * *" *Id* at 89-90.

There was testimony in the instant case that the shoulder was "muddy" and there were references to a "guard rail." A "guard rail" does not appear in the photographs but there is a snow-bank which might be covering one.

Kaczmarek might have been able to maneuver his truck so as to place it more on the shoulder and less on the road but it is not likely he would have been able to move it more than another foot off of the paved part of the road. This would, however, have been a chancy operation and we must reject the argument that he was negligent as a matter of law, in not making the attempt.

Weishaar also argues that the failure to put out flares constitutes negligence as a matter of law. If visibility had been limited to 50 feet at the time of, and just before, the collision, and the evidence in regard thereto was clear, uncontradicted and uncontroverted, the argument might be persuasive, but, as we have pointed out, there is a sharp conflict in this area. There was evidence that "* * * vehicles * * * [were] clearly discernible at a distance of 300 feet ahead" and in these circumstances Code, Art. 66½, § 271 (a) (1957) does not require the display of "lighted lamps and illuminating devices." Kaczmarek was required by Code, Art. 66½, § 300 (a) (1957) to carry flares, and it is agreed flares were in his truck, but § 300 (b) does not require their display except "during the period when lighted lamps must be displayed on vehicles." § 271 (a). The jury might very well have found that Kaczmarek rightly judged visibility to be sufficient to obviate the necessity of setting out flares. In any event, while a violation of a statute is evidence which may support a finding of negligence, it is not, without more, conclusive of negligence. *Ford v. Bradford, supra.* We might agree that he would have been well advised to set out flares but we must reject the argument that his failure to do so, under the circumstances, made him negligent as a matter of law. *Ford v. Bradford, supra; Meldrum v. Kellam Distr. Co.,* 211 Md. 504, 128 A. 2d 400 (1957) ; *Miles v. Webb,* 162 Md. 269, 159 Atl. 782 (1932).

## II.

Weishaar next contends that an improper instruction was granted at the request of Kaczmarek and that a proper instruc-

tion requested by him was refused. The record does not reveal what Kaczmarek requested in the way of an instruction but it seems to have dealt with the provisions of Code, Art. 66½, § 244 (1957).[2] Our examination of the court's instructions to the jury persuades us that his comments about the requirements of § 244 were fair and neither confusing nor misleading.[3]

Judge McLaughlin refused Weishaar's request for an instruction to the effect that the operator of a motor vehicle has a right to assume, even though visibility may be affected by fog, that the road ahead is safe for travel unless a danger is indicated by a red light or other warning signal. It is argued that the decision of our predecessors in *Marshall v. Sellers,* 188 Md. 508, 53 A. 2d 5 (1947) supports the right to such an instruction. The judge did tell the jury that Weishaar "had the right to assume that there wouldn't be anybody stopped out there," but he went on to say that he was still obliged to "make proper observation and keep a lookout for anything that might be there." We think Judge McLaughlin correctly refused the proffered instruction and that his instruction to the jury, taken as a whole, was within the scope of the holding in *Marshall v. Sellers, supra.*

---

**2.** § 244. Stopping, standing or parking outside of business or residence districts.

(a) *In general.* — Upon any highway outside of a business or residence district no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main-traveled part of the highway when it is practical to stop, park, or so leave such vehicle off such part of said highway, but in every event a clear and unobstructed width of at least twelve (12) feet of such part of the highway opposite such standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicle be available from a distance of 200 feet in each direction upon such highway.

(b) *Disabled vehicles.* — This section shall not apply to the driver of any vehicle which is disabled while on the paved or improved or main-traveled portion of a highway in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle in such position. (An. Code, 1951, § 209; 1943, ch. 1007, § 189.)

**3.** Counsel for Weishaar excepted to this portion of the court's instructions to the jury.

## III.

Immediately after the accident Canestrale ordered a replacement for the truck which had been destroyed. Because the body had to be specially fabricated for his use, delivery was not accomplished until five weeks later, during which time, in order to continue his business, he was obliged to hire a truck. He was permitted, over objection, to show that this cost him, at $175 per week (conceded to be reasonable) a total of $875, which amount the jury included in its verdict under the instructions of the court. Weishaar argues this is reversible error on the part of the trial judge.

*Barnes v. United Railways Co.,* 140 Md. 14, 116 Atl. 855 (1922) is cited in support of the proposition that when a motor vehicle is totally destroyed, and there is a recovery for its full value, there can be no recovery for loss of use. There was dictum to that effect in *Barnes* and, generally speaking, it is a correct statement of the law but there is a well recognized exception, which, while we seem not to have had occasion to consider it in the past, is, nevertheless, applicable in the case at bar. In the comment to § 927 of the Restatement, Torts (1939) it is said that "damages can properly include an amount for expenses in procuring a necessary substitute or for the value of the use of a substitute until a replacement of the subject matter can be made * * *."

*Guido, et al. v. Hudson Transit Lines,* 178 F. 2d 740 (3rd Cir. 1950), in the words of Judge Goodrich, who wrote the court's opinion, "is an almost perfect moot court case," and, we might add, singularly apposite to the instant case. The plaintiff there, because of post-war shortages, was not able to buy a new truck for two years. There was no attack upon the reasonableness of plaintiff's conduct nor the accuracy of his testimony. The same is true in respect of Canestrale. We think the language of Judge Goodrich, which we quote below, states the proper rule to be applied in the case at bar :

> "The rule is well established that the measure of damages for the conversion or destruction of a chattel is the market value of the chattel at the time and place of the conversion or destruction. While this is some-

times stated as though it were a rule applicable to vehicles it is a general rule applicable to all kinds of chattels. The justification for it is that this provides a convenient rule of thumb and, in case the article is readily replaceable on the open market, compensates the owner for his loss.

"The difficulty comes when this convenient rule of thumb is sought to be applied to every case regardless of the circumstances. This the defendant would have us do here and cites authorities which have taken this ironclad view of the matter. [Citing cases.] The fear of allowing 'speculative' damages has scared some courts into applying what Mr. Justice Christiancy years ago called 'the certainty of injustice.' [Allison v. Chandler, 1863, 11 Mich. 542, 555.]

"The general principle which should govern the matter is quite clear. Damages are supposed to compensate the injured person for the wrong which has been done him. [Restatement, Torts, § 910.] If his loss is greater than the market value of the chattel at the time of its destruction, an owner should, on principle, be allowed additional items which will adequately compensate him unless some of those claimed items are so speculative as to create danger of injustice to the defendant.

"Here we have the perfect case for the allowance of the additional element of damages. As pointed out above, the plaintiffs' case removed the possibility of speculation by careful proof which showed not only the possibility of profitable use but an actual contract for that use. This case, therefore, fits perfectly into the statement of the measure of damages set out in Section 927 of the Restatement of Torts." *Id* at 742.

*Accord, Chesapeake & Ohio Ry. Co. v. Elk Refining Co.,* 186 F. 2d 30 (4th Cir. 1950) ; *Buchanan v. Leonard,* 127 Fed. Supp. 120 (D. Col. 1954) ; *Louisville & I. R. Co. v. Schuester,* 183 Ky. 504, 209 S. W. 542 (1919) ; *Terrebonne v. Toye Bros. Yellow Cab Co.,* 64 So. 2d 868 (La. 1953).

We are not persuaded by Weishaar's argument. In our judgment the court correctly admitted the testimony and thereafter fully and fairly instructed the jury.

## IV.

Canestrale's cross appeal arises out of the exclusion of a bill offered to prove the value of the cargo which was destroyed in the accident. It is conceded that San Tourneau Cabinets was the owner of the cabinets and that Canestrale was obligated to pay for them. It is conceded also that as bailee he had a right to sue for their destruction. The only evidence offered to prove their value was the bill from San Tourneau to Canestrale. The court admitted the bill subject to exception but struck it at the conclusion of the evidence, correctly, we think, since its admission would have violated the rule against hearsay evidence. *Glen Burnie Plaza v. Schreiber,* 220 Md. 303, 152 A. 2d 807 (1959) ; *Green v. Caulk,* 16 Md. 556 (1861).

## V.

For the reasons set forth above the judgment will be affirmed.

*Judgment affirmed. Costs to be paid by appellants.*