WILLIAMSON TRUCK LINES, INC. ET AL.
*v.* BENJAMIN

[No. 198, September Term, 1965.]

*Decided September 13, 1966.*

4 

The cause originally was argued before HAMMOND, HORNEY, OPPENHEIMER and MCWILLIAMS, JJ., and RAINE, J., Associate Judge of the Third Judicial Circuit, specially assigned, and reargued before HAMMOND, HORNEY, MARBURY, OPPENHEIMER, BARNES and MCWILLIAMS, JJ., and RAINE, J., specially assigned.

*Hamilton O'Dunne* (on both arguments), with whom was *Patrick A. O'Doherty* on the brief, for the appellants.

*Thomas V. Friedman* (on both arguments), with whom were *Rosen & Esterson* on the brief, for the appellee.

BARNES, J., delivered the majority opinion of the Court. MARBURY and MCWILLIAMS, JJ., and RAINE, J., specially assigned, dissent. Dissenting opinion by MCWILLIAMS, J., at page 16, *infra*.

The appellee, Henry C. Benjamin, was the plaintiff below in an action in the Superior Court of Baltimore City against the Williamson Truck Lines, Inc., owner of a tractor-trailer, and against William B. Sasser (Sasser), its operator, to recover damages for personal injuries to the plaintiff, medical expenses and other losses, and property damage to the plaintiff's automobile resulting from an accident occurring on Maryland Route 3 on February 14, 1963. The action was originally tried before Chief Judge Manley and a jury. After the jury could not agree and was discharged, and after the denial by the lower court of motions of the defendants for a judgment *non obstante veredicto,* the parties waived a jury trial and the action was, by the agreement of counsel, submitted to the trial judge who had conducted the original jury trial for determination upon the record and testimony previously taken. The trial court rendered a verdict in favor of the plaintiff and against both defendants for $6,500.00. Judgment for this amount was made absolute on May 18, 1964 and the defendants filed a timely appeal from that judgment to this Court.

There is no challenge on the appeal to the amount of the verdict or to the finding of primary negligence of the defendants. The defendants-appellants, however, earnestly contend that

the plaintiff-appellee disentitled himself from recovery by his own conduct in that he was guilty of contributory negligence as a matter of law and assumed the very risk which materialized.

The accident occurred between 4:00 and 5:00 A.M. in the morning of February 14, 1963, a good distance south of Glen Burnie in Anne Arundel County on Maryland Route 3. Route 3 is part of a major north-south highway linking Baltimore with Richmond, Virginia. The accident occurred in the right hand northbound "slow" lane where the posted speed limit was, at the time of the accident, 60 miles per hour for automobiles and 55 miles per hour for trucks. At this point the median strip between the north and southbound lanes is extremely wide and the southbound lanes (which have no relation to the accident) are not visible to a northbound motorist.

The two northbound lanes are each twelve feet wide. These are separated by a white dashed line and are surfaced with black top macadam. There is a shoulder on both the east side and the west side of this northbound highway consisting of sand and gravel, and varying in width from eight to ten feet. The highway does not curve to the right or to the left for a quarter of a mile south of the scene of the accident, but from that point the road proceeds downhill at a 25 degree grade, bottoms, and then begins a 30 degree incline approximately 500 feet south of the point of impact.

The plaintiff was alone and was operating his 1953 Studebaker northbound in the right hand lane returning from Gambrills in Anne Arundel County to his home in Baltimore City. His automobile was equipped with standard headlights, tail lights and license plate light. These were all lighted and functioning normally at all times material to this case.

While the plaintiff was proceeding uphill toward the scene of the accident, the hood of his automobile, without prior warning, suddenly flew up and buckled over the cab of his Studebaker, obscuring his vision. The plaintiff had never had such trouble with the hood before. He pulled slowly to a stop in the right lane, very close to the shoulder, approximately 500 feet from the bottom of the hill. The plaintiff had traveled Route 3 a number of times before. He knew it was heavily traveled and was a high-speed expressway. He also knew there were shoulders at that point.

As soon as he had stopped, the plaintiff set his emergency brake and alighted from the right door of his automobile onto the shoulder of the road. He was unable to investigate the full width of the shoulder because it was pitch dark and he was afraid of walking into a ditch. He then stood on the shoulder for about one minute observing northbound traffic to be sure that approaching motorists could see his automobile before he ventured out into the highway to lower and secure the hood. He saw two or three northbound automobiles pass safely on the left of his stopped vehicle but he could not say in which lane they had approached it. He then observed a northbound tractor-trailer approach in the right lane, saw it cut over to the left lane when it was better than 100 yards to the rear of his automobile and pass safely by it. From the passing of the automobiles and the tractor-trailer, the plaintiff assumed that his automobile could be seen by approaching motorists and he then began to try to secure the hood. While on the right side of his automobile, he grabbed the top of the hood and used force to free it from where it had buckled over the cab of his vehicle. He then walked to the front and pushed down. Because of the buckle in the hood, the front of the hood would not go down and was far from latching. He then removed his belt and secured one end of the belt to the spring latch on the under side of the hood.

While he was tying the belt to the spring latch, the plaintiff saw for the first time the headlights of the tractor-trailer of Williamson Truck Lines, Inc., approximately one-quarter of a mile away, and heard the roar of the motor. The plaintiff could not determine in which lane this tractor-trailer was moving or its rate of speed. He then bent down in front of his automobile, stuck the other end of his belt through the grill and hooked it in once in an effort to tie the belt. He could hear the motor of the approaching tractor-trailer approaching as he worked. He then raised up to pull the hood down in order to get a better hold on the belt to tie it when he noticed the tractor-trailer a second time. It was then in the right hand lane close behind his automobile and bearing to the left lane. The right front of the tractor-trailer struck the left rear of the plaintiff's automobile, which in turn struck the plaintiff, knocking him to the

right shoulder of the road and into what Sasser (called by the plaintiff as a hostile witness) originally called a "ditch", but later explained was the "sloping of the bank." The plaintiff spent less than two minutes in front of his automobile in his attempt to secure the hood.

Sasser, the driver of the tractor-trailer which struck the plaintiff's automobile testified that he was traveling northbound in the right lane of the highway at a speed of 50 miles per hour when he noticed for the first time the plaintiff's automobile 400 feet ahead. When the tractor-trailer was 200 feet from the plaintiff's vehicle, he cut to the left lane. Sasser testified that the plaintiff's automobile appeared to swerve into the left lane when the tractor-trailer was approaching either a few feet or was two or three automobile lengths away. He did not reduce his speed from the time he first saw the plaintiff's automobile until the time of the impact, nor did he sound the electric or air horns with which the tractor-trailer is equipped. Although there were no other vehicles on the road ahead, Sasser did not continue to watch the vehicle in the road or determine if it was standing or moving at any time.

Corporal Werner, an experienced investigating officer of the Anne Arundel County Police, was the investigating officer. He testified that he received a telephone call in regard to the accident at 4:55 A.M. and arrived at the scene approximately five minutes thereafter. Upon his arrival it was a clear night, and the road was dry. There were no obstacles or curves in the road to obstruct vision for approximately a quarter of a mile approaching the scene northbound. He located the point of impact from the major part of the debris in the right lane of the highway. The automobile of the plaintiff was standing in the right lane with both doors jammed shut. He identified the 120 foot skid marks of the tractor-trailer beginning 30 feet before the impact in the slow (right) lane, then into the fast (left) lane and then back into the slow (right) lane again up to the tractor then ahead of the plaintiff's automobile but on the east shoulder of the highway.

It is clear from this evidence that there was sufficient evidence to support a finding that there was primary negligence upon the part of the driver of the tractor-trailer. The appellants

(defendants) do not contend in this Court to the contrary. As we have already indicated, the two contentions here are (1) the plaintiff was guilty of contributory negligence as a matter of law and (2) in any event, the plaintiff incurred the risk involved and is barred from recovery by the application of the maxim, *volenti non fit injuria*. We have concluded that these contentions of the appellants are unsound and that the judgment of the lower court must be affirmed.

### (1)

In considering the contention that the plaintiff was guilty of contributory negligence as a matter of law, there are certain well established general principles of law which we should keep in mind. They were recently enunciated by this Court in *Wiggins v. State, to the use of Collins,* 232 Md. 228, 237, 192 A. 2d 515, 520-521 (1963). Judge Horney, for the Court, stated:

> "The absence or presence of contributory negligence is generally a question for the jury. *Jackson v. Forwood,* 186 Md. 379, 47 A. 2d 81 (1946). It is only where the minds of reasonable persons cannot differ that the court is justified in deciding the question as a matter of law. *Brown v. Bendix Aviation Corp.,* 187 Md. 613, 51 A. 2d 292 (1947) ; *Thomas v. Baltimore Transit Co.,* 211 Md. 262, 127 A. 2d 128 (1956) ; *Boyd v. Simpler,* 222 Md. 126, 158 A. 2d 666 (1960). And if there is no evidence of acts or conduct from which reasonable minds could find or infer negligence on the part of a plaintiff, it would be error not to withdraw the issue of contributory negligence from the consideration of the jury. *Lindenberg v. Needles,* 203 Md. 8, 97 A. 2d 901 (1953) ; *Thomas v. Baltimore Transit Co., supra.*"

The defendants contended below—and as appellants in this Court—that the plaintiff violated the provisions of Code (1957) Art. 66½, §244 (a) and (b) and that this violation caused or contributed to the plaintiff's damages. This section of the Maryland Code is as follows:

"(a) *In general*—Upon any highway outside of a business or residence district no person, shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main-traveled part of the highway when it is practical to stop, park, or so leave such vehicle off such part of said highway, but in every event a clear and unobstructed width of at least twelve (12) feet of such part of the highway opposite such standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicle be available from a distance of 200 feet in each direction upon such highway.

"(b) *Disabled vehicles*—This section shall not apply to the driver of any vehicle which is disabled while on the paved or improved or main-traveled portion of a highway in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle in such position."

It is first contended that the plaintiff's automobile was not a "disabled vehicle" so as to come within the exclusion of §244 (b), and reliance is placed upon our decision in *Wiggins v. State, to the use of Collins, supra,* in which we indicated, in a case involving the stopping of an automobile to remove accumulating snow and ice from the windshield, that is was "generally held that the provisions of a statute exempting disabled vehicles from the prohibition of stopping on the highway are not applicable when the vehicle has been stopped on the main travelled part of such highway for the purpose of removing an obstruction from the windshield." 232 Md. at 239, 192 A. 2d at 522.

All of the cases which we cited in support of this statement involved the obstruction of the windshield by atmospheric conditions, i.e., snow, sleet, frost or ice. In none of the cases was the plaintiff confronted with a sudden emergency as was the plaintiff in the case at bar. These obstructions resulting from weather conditions came upon the windshield gradually and are different from a mechanical defect or failure of the hood catch in the vehicle itself. In our opinion, the facts in the case

at bar distinguish it from *Wiggins* and because of the mechanical failure in the catch holding the hood in place together with the surrounding circumstances already indicated, a question of fact was presented as to whether the plaintiff's automobile was such a "disabled vehicle" within the meaning of §244 (b) as to make it "impossible" to avoid "stopping and temporarily leaving such disabled vehicle in such position." Cf. *Tuhn v. Clark,* 241 Iowa 441, 41 N. W. 2d 13 (1950). We have heretofore construed the word "impossible" in this subsection to mean "obviously impractical in the circumstances" rather than as meaning an "absolute, physical impossibility." *Joppy v. Hopkins,* 231 Md. 52, 58, 188 A. 2d 545, 549 (1963). See also *Coastal Tank Lines v. Kiefer,* 194 Md. 81, 69 A. 2d 790 (1949).

The situation at bar is somewhat analogous to situations in which a motorist has a flat tire when the highway is dark or vision is made difficult by fog and the issue of whether the vehicle is a "disabled vehicle" within the meaning of the statute has been submitted to the jury. See *Putnam v. Bowman,* 89 N. H. 200, 195 Atl. 865 (1937); *Dare v. Boss,* 111 Or. 190, 224 Pac. 646 (1924).

Even if it be assumed, *arguendo,* that the plaintiff's automobile was not a "disabled vehicle" within the meaning of §244 (b), the question of whether it was "practical" for the plaintiff to have stopped, parked or "so leave such vehicle off such part of said highway" was required to be determined by the provisions of §244 (a). See *Coastal Tank Lines v. Kiefer, supra.*

The trial court, properly we think, submitted both issues to the jury. After the jury disagreed and was discharged, the trial court undoubtedly considered both issues of fact as the trier of the facts, and resolved them against the defendants.

It was pitch black when the hood suddenly rose up to obstruct completely the plaintiff's vision. There was evidence that the hood was so broad when in an upright position that it would not have permitted the plaintiff to have looked out his left window and drive to the left shoulder. The plaintiff knew there were ditches along the highway and he was properly apprehensive that he might drive into one unless he brought his automobile to a stop. This apprehension was not misplaced in the situation which suddenly confronted the plaintiff. Although

there was no "ditch" in the usual meaning of that word, there was a substantial incline not far from the edge of the shoulder on the east side of the highway which could easily have resulted in severe injury to the plaintiff and his automobile if he had misjudged the proper distance and gone down the embankment.[1] Considering the evidence most favorable to the plaintiff and the favorable inferences from that evidence—(as we should do when the defendants contend that the verdict should have been directed in their favor, see *Wiggins, supra,* and *Ford v. Bradford,* 213 Md. 534, 540, 132 A. 2d 488, 490 (1957))—we cannot say that there was no evidence from which a reasonable man could conclude that it was "obviously impractical in the circumstances to avoid stopping * * * in such position" or that it was not "practical to stop, park or so leave such vehicle off such part of said highway." Those issues were, therefore, properly submitted to the trier of fact for determination.

In addition to the facts already mentioned in discussing the effect of Art. 66½, §244, there are other facts which indicate to us that we cannot say that the plaintiff was guilty of contributory negligence as a matter of law.

The plaintiff was faced with an unexpected and sudden emergency. He realized that his automobile was in a place of danger, but he also realized that it was a clear night, the lights of his automobile, including the tail lights and the license plate lights, were burning and visible for one-quarter of a mile down the highway. He had the right to assume that oncoming mo-

---

1. Plaintiff's Exhibit 5—a photograph of the highway at the place of the accident—shows the incline with what appears to be a substantial grade. Sasser's testimony tends to confirm this. It is as follows:

"Q. Where was Mr. Benjamin immediately after the accident, if you know? A. Yes, he was partially in the ditch with his legs down in the ditch from his waist up, off on the edge of the shoulder.

"Q. What ditch are you speaking of? A. The slope of the shoulder.

"Q. This ditch that you are speaking of, is that ditch off the shoulder? A. It is not a ditch, it is a slope of the shoulder of the road.

"Q. You used the term ditch a moment ago? A. I didn't mean a ditch, it was sloping of the bank."

torists would see his lights and would avoid striking him as there was ample room in the fast or left hand lane in which to pass his vehicle. He did not, however, depend upon this assumption but put the assumption to a pragmatic test. He stood on the shoulder of the highway for approximately one minute observing the northbound traffic to be sure that approaching motorists could see his vehicle and would avoid striking it. He observed two or three automobiles and, more importantly, one tractor-trailer pass safely on the left of his stopped automobile. The originally observed tractor-trailer had been proceeding in the right lane and then when it was more than 100 yards from the rear of his automobile, it cut over to the left lane and safely passed his vehicle. Thus reassured that the lights of his automobile could be seen and his automobile avoided by approaching traffic, he then proceeded to attempt to fix the hood. We do not think that he was required to leave his work every time there was an approaching vehicle, to avoid being held guilty of contributory negligence *as a matter of law*. The entire issue of contributory negligence was for the trier of fact and the trial court was correct in not directing a verdict for the defendants upon this issue.

The case at bar is quite distinguishable, in our opinion, from our decision in *Martin v. Sweeney*, 207 Md. 543, 114 A. 2d 825 (1955), relied on by the appellants. In *Martin*, the plaintiff remained in a truck which was stopped on a rainy night facing oncoming traffic on that part of the *fast lane* of the expressway where her vehicle had skidded earlier. The plaintiff did not know whether or not the headlights of her truck were lit. She saw that the slow lane was occupied with traffic and she knew that vehicles might pass other vehicles in the lane in which her truck was standing. She continued to sit in the truck although she knew that oncoming vehicles would reduce their speed rapidly on the slippery highway at the place occupied by her truck in order to negotiate a turn required by a detour. The truck was not disabled and could have been moved with little difficulty from the place of danger. We held that under those circumstances the trial court properly directed the verdict in favor of the defendant because of the plaintiff's contributory negligence as a matter of law. In the case at bar, the vehicle of

the plaintiff was stopped in the *slow lane* and there was a clear and unobstructed lane in which the tractor-trailer could have passed, the road was not slippery, the lights of the plaintiff's vehicle were on and could be seen and had been seen by approaching vehicles for sufficient time to enable them to pass the plaintiff's automobile in safety.

## (2)

The appellants contend, as we have indicated, that the plaintiff is barred from recovery in this case because of the doctrine of incurred risk resulting from the application of the maxim, *"volenti non fit injuria."* Although closely allied to the doctrine of contributory negligence, our predecessors in *People's Drug Stores v. Windham,* 178 Md. 172, 12 A. 2d 532 (1940) have pointed out that the doctrines are not the same. There is a distinction between the doctrine of assumed risk and that of incurred risk, the former being applicable, if at all, to a situation in which there is a contractual relation between the parties involved, the latter being applicable, if at all, when there is no such contractual relationship.

Judge Offutt, for the Court, stated:

"The doctrines of assumed risk and contributory negligence are closely allied, but they are not the same thing. The doctrine of assumed risk implies intentional exposure to a known danger, which may or may not be true of contributory negligence. As stated in A. L. I. *Restatement of Torts,* sec. 893: 'A person who knows that another has created a danger or is doing a dangerous act or that the land or chattels of another are dangerous, and who nevertheless chooses to enter upon or to remain within or permit his things to remain within the area of risk is not entitled to recover for harm unintentionally caused to him or his things by the other's conduct or by the condition of the premises, except where the other's conduct constitutes a breach of duty to him or to a third person and has created a situation in which it is reasonably necessary to undergo a risk in order to protect a right or avert a harm.' An application of that rule to facts

somewhat analogous to those involved in this case is found in Illustration 9 to Comment C. of that section. The doctrine, literally, is not applicable to such a case as this, because here there was no contractual relation between the parties, but this case falls rather within the doctrine of incurred risk, which is derived from the maxim that *'Volenti non fit injuria.'* *But under neither doctrine was the plaintiff required to anticipate that he would be exposed to a hazard not naturally incidental to his situation, but arising from negligence which he had no reason to foresee.* O'Malley v. South Boston Gas Light Co., 158 Mass. 135, 32 N. E. 1119; 47 L. R. A. 161; 19 A. L. R. 4; *Wood v. Heiges*, 83 Md. 257, 34 A. 872; *Maryland, Delaware & Virginia R. Co. v. Brown*, 109 Md. 304, 81 A. 1005; 28 L. R. A., N. S., 1220." (Emphasis supplied for the last sentence). 178 Md. at 186-187, 12 A. 2d at 539.

See also *Baltimore County v. State, to the use of Keenan*, 232 Md. 350, 359-361, 193 A. 2d 30, 35-36 (1963).

In *People's Drug Stores v. Windham, supra*, the plaintiff Windham, seeing a Chevrolet which had had a collision with another vehicle while driving through a "smoke screen" across the Rockville Pike, U. S. Route 240, resulting from a pile of burning hay, the "smoke screen" obscuring the vision of motorists passing through it, parked his automobile, returned to the scene of the collision and stood in front of the Chevrolet to lift the bent right front fender from the wheel, when the tractor-trailer of People's Drug Stores was driven through the "smoke screen" at between fifty to sixty miles per hour, struck the Chevrolet, which in turn struck the plaintiff Windham and seriously injured him. It was held that the trial court properly refused the requested instruction by the defendant that Windham was barred by the doctrine of incurred risk.

In our opinion *Windham* is persuasive in the case at bar that the doctrine of incurred risk does not bar the plaintiff's recovery. Here too, the plaintiff had no reason to anticipate the negligence of Sasser in operating the tractor-trailer in failing to drive that vehicle into the fast lane after seeing the plaintiff's

tail and license plate lights in sufficient time to pass safely as the automobiles and one tractor-trailer had already done. See *Maryland D. & V. Ry. Co. v. Brown,* 109 Md. 304, 326, 71 Atl 1005, 1014 (1909). As was well stated in 61 C.J.S. *Motor Vehicles,* §476b, pages 71-72:

> "A person engaged in repairing or assisting the movement of a vehicle on the highway is required to exercise only that degree of care which ordinarily prudent persons would use under the same or similar circumstances to avoid injury. He is not bound to anticipate negligence on the part of the operators of approaching vehicles, and, in the absence of circumstances which would afford notice to the contrary, he may rely to some extent on the belief that the operators of motor vehicles will exercise ordinary care and will observe the rules of the road so as to avoid injuring him. Accordingly, he need not continuously watch for approaching vehicles where the nature of the work in which he is engaged requires his attention."

See also *Doss v. Martin,* 205 Va. 306, 136 S. E. 2d 854 (1964); *Badurina v. Bolen,* 114 Ohio App. 478, 183 N. E. 2d 241 (1961); *Holman v. Uglow,* 137 Or. 358, 3 P. 2d 120 (1931); and *Hanson v. Aldrich,* 199 Iowa 168, 201 N. W. 778 (1925).

As the trial court, in rendering a verdict for the plaintiff, aptly stated:

> "[H]is testimony was that several other similar vehicles had gone by that pulled out into the fast lane, and went by him and he assumed that this Defendant's unit would also go by. That is a heavily traveled highway and if he is going to jump out of the way everytime a vehicle would come along he would never get his car fixed, and he had the right, I think, to assume that having his lights on that there should not be any danger to him because the lighted vehicle was visible to any of the traffic on the highway, and he had to try to fix the condition which had caused him to stop on the highway, * * *."

In our opinion, the plaintiff in this case was not barred from recovery because of the doctrine of incurred risk.

*Judgment affirmed, the costs to be paid by the appellants.*

McWILLIAMS, J., filed the following dissenting opinion, in which MARBURY, J., and RAINE, J., specially assigned, concurred.

I think my brothers of the majority have been bewitched by the hyperbolic use of an ancient cliche. Probably the expression "pitch dark" has been in the English language since the days of Chaucer. The Oxford Dictionary cites its use by Mabbe in 1662. Subsequent usage seems to connote the virtual absence of all light. Disraeli, in one of his early novels, wrote, "The *stars* prevented it from ever being *pitch dark*." (Emphasis supplied.) Dickens spoke of ascending "these pitch-dark stairs." I think the majority intend a like connotation when they say the appellee "was unable to investigate the full width of the shoulder because it was *pitch dark* and he [appellee] was afraid of walking into a ditch." It should be observed that "pitch dark" is the expression used by appellee to justify his leaving the car on the traveled portion of the highway. Although the majority have adopted his language I think the facts disclose a situation which should preclude the use of the expression "pitch dark" to describe the degree of visibility existing at the time of the accident.

That the night was clear is undisputed. The opinion states that "upon his [Corporal Werner of the Anne Arundel County Police] arrival it was a clear night." Later the opinion goes on to say "he [appellee] realized that his automobile was in a place of danger, but he also realized that it was a clear night." According to the official weather statistics (not in the record but which I have examined) the sky was clear (no overcast) and the *quarter moon* was just about overhead. (Moon rise, 11:34 P.M.; moon set, 10:15 A.M.) I agree that in the available light one would not have been able to read a newspaper but I know, as must everyone, that there was enough to determine the width of the shoulder.

However, assuming for argument's sake, the insufficiency of natural light there was, I think, enough artificial light. I quote from the opinion:

"He then stood on the shoulder for about one minute observing northbound traffic to be sure that approaching motorists could see his automobile before he ventured out into the highway to lower and secure the hood. He saw two or three northbound automobiles pass safely on the left of his stopped vehicle but he could not say in which lane they had approached it. He then observed a northbound tractor-trailer approach in the right lane, saw it cut over to the left lane when it was better than 100 yards to the rear of his automobile and pass safely by it."

The headlamps of those passing vehicles (assuming them to have been legally adequate) must have illuminated the right (and the left) shoulder as they approached the appellee. To see the shoulder all he had to do was look at it. Furthermore, it is undisputed that, during the entire time he was stopped, his engine was running and *all of his lights (front and rear) were on*. It is my experience that, in these circumstances, there is enough diffused light to enable one to see the shoulder. Judge Raine, who joins in this dissent, has said that his experience supports my own.

Finally, it would have been a simple matter for the appellee to have turned his front wheels to the right and to have moved his car a few feet forward. This would have directed the beam of his headlamps to the shoulder and, if he could not then have seen forward because the hood was blocking his vision (which I doubt), he could have stepped out of his car and examined the shoulder (which was at that point at least 8 feet wide). Then he could have resumed his seat behind the wheel and moved the car off of the hard surface. I doubt if there is a person licensed to drive in Maryland who could not have accomplished this maneuver safely and within 30 seconds. According to the opinion appellee's car was stopped on the highway for at least 3 minutes.

In holding appellee's vehicle to have been "disabled" so as

to come within the exclusion of § 244 (b) of Art. 66½ the majority, in my judgment, have gone far afield. I cannot believe the statute means that a vehicle which may be disabled from proceeding along the highway at 50 miles per hour is, in the circumstances here present, also disabled to the extent that it is impossible (or impractical) to move it from the hard surface to the shoulder, especially with all lights ablaze, the engine running and everything in working order except the hood, which appellee had no difficulty pushing down but which would not stay down, *at highway speeds,* without being fastened.

I would have reversed without a new trial, as would Judge Marbury and Judge Raine, who concur in the views expressed herein.